# CEMENT MANUFACTURERS PROTECTIVE ASSO-
## CIATION ET AL. *v.* UNITED STATES.

·APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES
FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 551. Argued March 3, 5, 1925.—Decided June 1, 1925.

1. Dissemination of information enabling sellers of goods under contracts for future delivery individually to prevent purchasers from fraudulently procuring deliveries on the pretense that the sellers are obligated by their contracts to make them, is not an unlawful restraint of trade, even though the information be gathered by and disseminated among the sellers themselves through coöperation. P. 603.

2. Coöperation of manufacturers in gathering and exchanging (1) information concerning production of cement and the prices for which it was sold by them in actual, closed " specific job " contracts constituting but a part of their business, and (2) information of transportation costs from chief points of production, *held* not an unlawful restraint on commerce, even assuming that ·the result .may tend to bring about uniformity of price, through the operation of economic law. P. 604.

3. In this case the Government did not rely upon any agreement or understanding for price maintenance; and the record fails to establish, either directly of by inference, any concerted action other than that involved in the gathering· and dissemination of information, respecting sale and distribution, which in itself the Court finds not unlawful; nor does the evidence show any effect on price and production except such as would naturally flow from the dissemination of such information in the trade and its natural influence on individual action. P. 606.

4. In a suit under the Anti-Trust Act to dissolve a trade association formed by numerous manufacturers of Portland cement, it appeared: (1) That, following trade practice, each manufacturer disposed of part of its product through " specific job contracts ", i. e., contracts in effect obligating the manufacturer to deliver in the future to the purchaser at a maximum price named, payable on delivery, the cement required to complete a specified piece of construction work, but allowing the purchaser. the advantage of any decline, before delivery, in market price, and not obligating him in any event to take the cement contracted for; (2) that to pre-

vent contractors from obtaining more cement than they were entitled to under such contracts by the practice of entering into several such contracts with several manufacturers for the same specific job, the details of such contracts were reported by the members to the association, agents of the latter visited the jobs, and the fullest information respecting the contracts and the use of cement shipped under them was reported to the members by the secretary; and there were many cancellations of deliveries under such contracts on the ground that purchasers were not entitled to delivery by the terms of their agreements; (3) that the association compiled and distributed to its members books listing freight rates from established basing points to many cities and towns, enabling the manufacturer to calculate a delivery price on the basis of its own mill price (determined by itself) to places nearest in point of freight rate to its own mill, and also to determine at once the freight differential it must offset in its mill price in order to compete with other manufacturers serving any other given territory; (4) that members of the association rendered monthly detailed reports concerning delinquent accounts of their customers; (5) and reports of production, shipments and stock on hand, which, being compiled and distributed, informed each member fully of the available supply of cement and by whom it was held; (6) that, by universal practice of the trade, the price of bags in which cement was shipped was included in the mill base price; and that quarterly reports were made to the association showing the total number of bags returned to each member by customers during the preceding quarter and the percentage found unfit for use; but no information was reported concerning the charge and allowance for bags returned, the number received from any particular customer, or the portion found unfit for use; (7) that periodical meetings were held at which minor subjects, such as return of bags, bag reports, and trade acceptances, were discussed, but not current or future prices, or production or market conditions; which meetings were not proved to have resulted in any agreement or in any uniformity of trade practice. *Held* that a purpose to control production and price of cement could not be inferred from such activities, and they were not in themselves unlawful restraints of commerce prohibited by the Anti-Trust Act. P. 592.

Reversed.

APPEAL from a decree of the District Court in a suit brought by the Government under the Anti-Trust Act,

enjoining the continuance of a combination of various cement manufacturers, in the form of a trade association.

*Mr. John W. Davis,* with whom *Messrs. George T. Buckingham* and *Archibald Cox.* were on the brief, for appellants.

*Mr. J. A. Fowler,* Special Assistant to the Attorney General, with whom the *Solicitor General* and *Mr. Roger Shale,* Special Assistant to the Attorney General, were on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

This is an appeal from a final decree of the District Court for the Southern District of New York granting a perpetual injunction in a proceeding brought by the United States under § 4, Chapter 647, of the Act of July 2, 1920, 26 Stat. 209, commonly known as the Sherman Act. Defendants are the Cement Manufacturers Protective Association, an unincorporated association, four individuals, the officers of the Association, and nineteen corporations, members of the Association, engaged in manufacturing and shipping Portland cement in interstate commerce, in Pennsylvania, New Jersey, New York, Maryland and Virginia. The petition, which was filed on the 30th day of June, 1921, alleges restraint of interstate commerce in violation of § 1 of the Act. The complaint prays that the Cement Manufacturers Protective Association be adjudged a violation of § 1 and enjoined accordingly. After final hearing, the District Court entered its decree enjoining the continuance of the Cement Manufacturers Protective Association and enjoined it and the several defendants from engaging in the activities of which the Government complains and of which a summary account will presently be given.

The Association was organized in January, 1916. Its purposes, as described by the constitution, were the " col-

lection and dissemination of such accurate information as may serve to protect each manufacturer against misrepresentation, deception and imposition, and enable him to conduct his business exactly as he pleases in every respect, and particularly free from misdirection by false or insufficient information concerning the following matters, to wit:

(a) Information concerning credits;

(b) Information concerning contracts which have been made for the delivery of cement sufficiently complete to enable the manufacturer to protect himself against spurious contracts and like transactions induced by misrepresentations;

(c) Information concerning freight rates on cement;

(d) Statistical information as to production; stocks of cement and clinker on hand, and shipments."

The constitution also provides that "membership in the Association shall be recognized as implying that the member is absolutely free to conduct his business exactly as he pleases in every respect and particular."

Cement is a thoroughly standardized product. It is manufactured from limestone and shale which are crushed to extreme fineness, then subjected to high temperatures, which process produces a fused mass which when cooled is known as clinker. The clinker is then ground into the finished product which is then ready for transportation and use. Clinker is not subject to deterioration, but the ground clinker or cement deteriorates rapidly on exposure to moisture and cannot be kept in storage except for a limited period of time. The defendant corporations are manufacturers of this product, which is shipped in interstate commerce principally within the areas of the several States in which the several defendants are located, and they are competitors in the business of shipping the product in interstate commerce. From 60% to 65% of the total product of the several corporate defendants is sold

to the general trade for immediate use.· Of this 60% to 65% approximately two-thirds is sold to dealers who are allowed a differential from the sales price to the retail trade.

The activities of defendants on which the Government bases its case for an injunction may summarily be stated as follows: The Government charges that the defendants, through the activities of the Association, control prices and production of cement within the territorial area served by the several defendants in the following manner:

(1) By the use of "specific job contracts" for future delivery of cement, accompanied by a system of reports and trade espionage having as its objective the restriction of deliveries of cement under those contracts.

(2) By compiling and distributing, among the members, freight-rate books which give the rate of freight from arbitrary basing points to numerous points of delivery within the territorial area served by the several defendants;

(3) By exchange of information concerning credits;

(4) By activities of the Association at its meetings.

The Government asserts that uniformity of prices and limitation of production are necessary results of these activities of the defendants. It does not, however, charge any agreement or understanding between the defendants placing limitations on either prices or production. The evidence does not establish that prices were excessive or unreasonable, and the District Court found " as compared with the rise of prices of other basic commodities, it is possible to say that the quotations of cement advanced less than others." The court also found that competition had not been destroyed by the Association and that upon many occasions the defendants were active in endeavoring to take business from companies associated with them. The court, however, held that the activities of the defendants in connection with specific job contracts tended to

limit the amount of cement distributed to the trade under those, contracts; that the exchange of information complained of generally tended to limit production; that the dissemination of this information, especially that contained in the freight-rate book, tended to produce uniformity in price, and that there was accordingly a restraint of commerce within the principles laid down in *American Column & Lumber Co.* v. *United States,* 257 U. S. 393; *United States* v. *American Linseed Oil Company,* 262 U. S. 371.

It is conceded, and the court below found, that before the organization of the present association there was substantial uniformity of trade practices in the cement trade, so far as is pertinent to the present discussion, in the following respects:

(1) The sale of cement by specific job contracts for future delivery;

(2) The selling of cement, f. o. b. delivery;

(3) Using freight basing points in the quotation of prices;

(4) Including in all quotations for sale of cement, a freight rate from a basing point to the place of delivery;

(5) Charging purchasers of cement for bags in which the product is shipped and allowing credit for bags returned to the manufacturers in good condition.

Since there is no exchange of information among the defendants with respect to contracts for the sale of cement for immediate delivery, which constitutes more than 60% of the business, the Government's contention before this Court centered upon the use of the specific job contract by defendants and their activities in connection with such contracts, since without the use of the specific job contract the other activities complained of could have no substantial bearing on restraint of competition with respect either to prices or production. It will therefore be necessary to

consider more at length the activities of the defendants in connection with specific job contracts and incidentally their other activities as related to sales of cement under specific job contracts and the information exchanged with respect to such contracts.

### Specific job contracts.

The specific job contract and the practices of the trade with respect to making deliveries in performance of those contracts were customary in the trade long before any of the collective activities complained of in this case. We do not understand the Government to contend that the use of specific job contracts by defendants, or that their use generally by the trade, is the result of any agreement or understanding, or in itself constitutes any violation of the Sherman Law. It is contended that the violation arises rather from the co-operation among the several defendants in acquiring and distributing information with reference to specific job contracts and the effect of the dissemination of that information on the trade, to which reference will now be made.

The specific job contract is a form of contract in common use by manufacturers of cement whereby cement is sold for future delivery for use in a specific piece of construction which is described in the contract. As was stated in the opinion of the court below, they are contracts "whereby a manufacturer is to deliver in the future, cement to be used in a specific piece of work, such as a particular building or road, and the obligation is that the manufacturer shall furnish and the contractor shall take only such cement as is required for or used for the specific purpose." These contracts have, by universal practice, been treated by cement manufacturers as, in effect, free options customarily made and acted upon on the understanding that the purchaser is to pay nothing until after

the delivery of the cement to him; that he is not obligated in any event to take the cement contracted for unless he chooses to; that he is not held to the price named in the contract in the event of a decline in the market price; whereas the manufacturer may be held to the contract price if the market advances and may be held for the delivery of the full amount of cement required for the completion of the particular piece of construction described in the contract. The practical effect and operation of the specific job contract therefore is to enable contractors who are bidding upon construction work to secure a call or option for the cement required for the completion of that particular job at a price which may not be increased, but may be reduced if the market declines. It enables contractors to bid for future construction work with the assurance that the requisite cement will be available at a definitely ascertained maximum price.

In view of the option features of the contract referred to, the contractor is involved in no business risk if he enter into several specific job contracts with several manufacturers for the delivery of cement for a single specific job. The manufacturer, however, is under no moral or legal obligation to supply cement except such as is required for the specific job. If, therefore, the contractor takes advantage of his position and of the peculiar form of the specific job contract, as modified by the custom of the trade, to secure deliveries from each of several manufacturers of the full amount of cement required for the particular job, he in effect secures the future delivery of cement not required for the particular job, which he is not entitled to receive, which the manufacturer is under no legal or moral obligation to deliver and which presumably he would not deliver if he had information that it was not to be used in accordance with his contract. The activities of the defendants complained of are directed toward securing this information and communicating it

to members and thus placing them in a position to prevent contractors from securing future deliveries of cement which they are not entitled to receive under their specific job contracts, and which experience shows they endeavor to procure especially in a rising market.

. Members are required to make to the secretary of the Association prompt reports of all specific job contracts, describing in detail the contract and giving the name and address of the purchaser; the amount of cement required, the price and delivery point; also the date of expiration of the contract. They are also required to make detailed reports of all changes in the contract, including increases in the amount of cement to be delivered and cancellations. The Association also employs " checkers " whose business it is, by actual inspection and inquiry, to ascertain, so far as possible, the amount of cement required for specific jobs referred to in specific job contracts, and whether cement shipped under specific job contracts is actually used or required for use under such contracts. Without entering into any detailed discussion of this phase of the activity of defendants, we accept fully the Government's contention that the defendants regularly take all practicable steps to ascertain whether cement contracted for under the specific job type of contract was actually being used for the job described in the contract, and that the fullest information with respect to such contracts and the use of cement shipped under said contracts is reported to the members of the Association through the mediation of the secretary.

The Government does not contend that the activities of the Association with respect to specific job contracts diminished the number of such contracts, or that they diminished in any way the obligations of members of the Association upon such contracts. There is, however, abundant evidence to show that there were actual cancellations of deliveries on the ground that contractors were

not entitled, under the terms of their contracts, to receive such deliveries. In 1920, of 1,392 contracts investigated and found to be "padded" to the extent of more than 3,500,000 barrels of cement, 978 were partially cancelled to the extent of 2,014,653 barrels.

### The Association freight-rate book.

The custom in the cement trade of selling cement at a delivered price which includes the mill price, the price of bags and freight charges, was an established trade practice before the organization of the defendant association. As required by the by-laws of the defendant association, it has distributed to its members freight-rate books, listing freight rates from established basing points to practically every city and town in the northeast section of the United States. The freight rates contained in the freight-rate book are compiled from the official tariffs and translated from the rate per ton of the official tariffs into the rate per barrel of 380 pounds, the unit for the sale of cement. Similar lists of freight rates embracing substantially the same subject matter were prepared and used by individual manufacturers before the organization of the defendant association. The association freight-rate book took the place of previous separate publications by individual manufacturers, with a consequent saving of money and increase of accuracy and a more thorough and continuous checking of rates. The basing points from which freight rates were calculated were not selected by the Association, but were the same as those appearing in prior books published by individuals before the publication of the Association freight-rate book. The basing points are points of actual shipment from which the larger proportion of the cement in a given locality in which cement is manufactured is actually shipped. The rates published are the actual rates omitting fractions of cents between the basing points and actual points of delivery.

Manufacturers customarily, and for the purpose of the convenient conduct of their business, maintain a uniform base or factory price, so far as the customers of the individual manufacturer are concerned. That is to say, the business is conducted on a "one-price" basis. In order, however, to determine the delivered price, there must be added to the factory price of a given manufacturer, the cost of transportation to the point of delivery. Prompt quotation of a delivered price therefore involves the ability to carry out promptly the mechanical process of adding to the mill price, the cost of transportation to the point of delivery. Lists of freight rates, in convenient and readily available form, are therefore necessary adjuncts to the quotation of delivery prices for cement.

The use of basing points for the purpose of computing freight rates appears not to have been the result of any collective activity on the part of defendants or cement manufacturers generally, nor were they arbitrarily selected. Their use is rather the natural result of the development of the business within certain defined geographical areas. When a manufacturer establishes his factory at a given point of production and sells his product in a territory which is contiguous freightwise to his factory, other mills established in the vicinity and serving the same territory, in order to compete in that territory, must either secure a like freight rate or they must sell at a mill price which will permit them to deliver cement at a price which will enable them to compete with the mill or mills located at the basing point which is the principal point of production in the territory which is contiguous in point of freight rate to the basing point. If such competing mills secure the same freight rate through the adoption of a blanket freight rate by the Interstate Commerce Commission, as was done in the Lehigh Valley, the rate from the basing point would in every case be identical with the freight rate for the competing mills. If there were no

blanket freight rate the competing mills must still use the rate from a given basing-point in order to compete with the mills located in the vicinity of that chief point of production. In either case the freight rate from the basing point is an essential element in making a delivered price, since selling by any particular manufacturer at the lowest of the delivered prices computed from several basing points is a necessary procedure in competing in the sale of cement. The freight-rate book, therefore, not only enables the manufacturer to calculate a delivered price on the basis of his own mill price, which he determines, to points in the territory nearest in point of freight rate to his own mill, but it enables him also to determine at once the freight differential which he must offset in his mill price in order to compete with other manufacturers serving any other given territory.

### Exchange of information concerning credits.

Members of the Association render monthly reports of all accounts of customers two months or more over due, giving the name and address of the delinquent debtor, the amount of the overdue account in ledger balance, accounts in hands of attorneys for collection, and any explanation, as for example when the account was treated by the debtors as offset of a balance due for bags, or was otherwise disputed. There are also reports showing the general total of delinquent accounts in comparison with those for the last twelve months, and reports of payments of accounts placed in the hands of attorneys. There was a form, seldom used, for answering inquiries as to whether a particular name had appeared in the monthly report, and if so, where. There were never any comments concerning names appearing on the list of delinquent debtors. The Government neither charged nor proved that there was any agreement with respect to the use of this informa-

tion, or with respect to the persons to whom or conditions
under which credit should be extended. The evidence
falls far short of establishing any understanding on the
basis of which credit was to be extended to customers or
that any co-operation resulted from the distribution of
this information, or that there were any consequences from
it other than such as would naturally ensue from the
exercise of the individual judgment of manufacturers in
determining, on the basis of available information,
whether to extend credit or to require cash or security
from any given customer.

### Statistical information.

The statistical activities of the Association, other than
those relating to specific job contracts which have already
been referred to, dealt with information as to existing
supplies of cement and the so-called bag report, which
gave information concerning returned bags which are the
usual containers in which cement is shipped and delivered.

Each member of the Association, in addition to the re-
ports on specific job contracts already referred to, sends to
the Association a monthly statement of its production of
clinker and ground cement, shipments and stock on hand
for the past month and for the corresponding periods of
the previous year. These were compiled and distributed
to members without any change or comment. In addi-
tion, semi-monthly statements of shipments were also re-
ceived and likewise distributed. Each member of the As-
sociation was thus given full information as to the avail-
able supply of cement and by whom it was held.

By universal practice, the price of bags in which cement
is shipped is included and becomes a part of the mill base
price. This is usually at the rate of ten cents per bag.
The bag reports were made quarterly and contained two
items; the total number of bags returned by each member

during the preceding quarter and the percentage thereof found unfit for use. The reports show that the loss varied from about 3/4 of 1% by one manufacturer to about 4½% by another, and the diversity continued throughout the period covered by the reports. In 1918 a questionnaire was sent out enquiring as to the practice of each company, to determine whether better results were obtained by cleaning before or after counting, showing that some counted before cleaning and some after cleaning, and some both before and after. No information was reported concerning the charge and allowance or deposit for bags returned, or concerning the number received from any particular customer, or the portion found unfit for use.

### Meetings.

The constitution and by-laws of the Association provided for monthly meetings. A full and accurate stenographic report of all discussions at meetings was kept and made available to the Government and, as is stated in the Government's brief, " the Association's counsel was present at every meeting to steer the discussions away from illegal subjects and to have them confine the matters strictly within the purview of the by-laws and the constitution of the Association." During the only period of rising markets since the relinquishment of war control, the spring and summer of 1920, no meetings were held during July and August. The later minutes contained complaints at smallness of attendance, and the number of companies represented at meetings varied from eleven to seventeen, with an average attendance of about two-thirds of the total membership of nineteen corporations. There was no discussion at these meetings of current prices; no comment on conditions or as to prospect of market, production or prices. Excerpts from the minutes are set out by the Government's brief at great length in-

dicating that from time to time individual representatives of the companies expressed themselves on subjects of minor importance; such as return of bags and bag reports, discounts, the use of trade acceptances where customers desired more than the customary thirty days' discount. But with reference to these suggestions and discussions, either no action was taken, or action was taken adverse to the suggestions made. There is no evidence that any agreement was reached affecting any of the matters discussed; nor does the Government point specifically to any uniformity of trade practice or custom followed, which is urged as even inferentially the result of activities at meetings.

### Legal consequence of defendants' activities.

From these various activities of the defendants, the Government deduces a purpose to control the price of cement, which it is charged was to be accomplished by the control of the supply of cement on the market and by intimate association of the defendants in the exchange of information and a ready means of quoting a delivered price at any point. Cement was to be kept from the market by the use of the specific job contract accompanied by the systematic gathering and reporting of information with reference to the specific jobs and the amount of cement required for their completion. The two essential elements in the conspiracy to restrain commerce charged therefore are (a) the gathering and reporting of information which would enable individual members of the Association to avoid making deliveries of cement on specific job contracts which by the terms of the contracts they are not bound to deliver, and (b) the gathering of information as to production, price of cement sold on specific job contracts and transportation costs, not differing essentially from similar information disseminated by the Maple Flooring Association which is the subject of

the opinion in *Maple Flooring Association* v. *United States,* decided today, *ante* p. 563.

That a combination existed for the purpose of gathering and distributing these two classes of information is not denied. That a consequence of the gathering and dissemination of information with respect to the specific job contracts was to afford to manufacturers of cement, opportunity and grounds for refusing deliveries of cement which the contractors were not entitled to call for,—an opportunity of which manufacturers were prompt to avail themselves—is also not open to dispute. We do not see, however, in the activity of the defendants with respect to specific job contracts any basis for the contention that they constitute an unlawful restraint of commerce. The Government does not rely on any agreement or understanding among members of the Association that members would either make use of the specific job contract, or that they would refuse to deliver "excess" cement under specific job contracts. Members were left free to use this type of contract and to make such deliveries or not as they chose, and the evidence already referred to shows that in 1920 padded specific job contracts were cut down something less than two-thirds of the total amount of the padding, as a result of the system of gathering and reporting this information. It may be assumed, however, if manufacturers take the precaution to draw their sales contracts in such form that they are not to be required to deliver cement not needed for the specific jobs described in these contracts, that they would, to a considerable extent, decline to make deliveries, upon receiving information showing that the deliveries claimed were not called for by the contracts. Unless the provisions in the contract are waived by the manufacturer, demand for and receipt of such deliveries by the contractor would be a fraud on the manufacturer; and, in our view, the gathering and dissemination of information which will enable

sellers to prevent the perpetration of fraud upon them, which information they are free to act upon or not as they choose, cannot be held to be an unlawful restraint upon commerce, even though in the ordinary course of business most sellers would act on the information and refuse to make deliveries for which they were not legally bound.

In *Swift & Co.* v. *United States*, 196 U. S. 375, 395, this Court approved a decree which provided that defendants should not be restrained " from establishing and maintaining rules for the giving of credit to dealers where such rules in good faith are calculated solely to protect the defendants against dishonest or irresponsible dealers.". Distribution of information as to credit and responsibility of buyers undoubtedly prevents fraud and cuts down to some degree commercial transactions which would otherwise be induced by fraud. But for reasons stated more at length in our opinion in, *Maple Flooring Association* v. *United States, supra,* we cannot regard the procuring and dissemination of information which tends to prevent the procuring of fraudulent contracts or to prevent the fraudulent securing of deliveries of merchandise on the pretense that the seller is bound to deliver it by his contract, as an unlawful restraint of trade even though such information be gathered and disseminated by those who are engaged in the trade or business principally concerned.

Nor, for the reasons stated, can we regard the gathering and reporting of information, through the co-operation of the defendants in this case, with reference to production, price of cement in actual closed specific job contracts and of transportation costs from chief points of production in the cement trade, as an unlawful restraint of commerce; even though it be assumed that the result of the gathering and reporting of such information tends to bring about uniformity in price.

Agreements or understanding among competitors for the maintenance of uniform prices are of course unlawful

and may be enjoined, but the Government does not rely on any agreement or understanding for price maintenance. It relies rather upon the necessary leveling effect upon prices of knowledge disseminated among sellers as to some of the important factors which enter into price. It is conceded that there is a substantial uniformity of price of cement. Variations of price by one manufacturer are usually promptly followed by like variation throughout the trade. As already indicated, the larger proportion of the product of the defendants is distributed through dealers, and prices to dealers are not reported to or through the Association. It is contended by the Government that the report of prices on specific job contracts in effect informs the members of the Association of prices to dealers, since the differential allowed to dealers is well known in the trade. However this may be, the fact is that any change in quotation of price to dealers, promptly becomes well-known in the trade through reports of salesmen, agents and dealers of various manufacturers. It appears to be undisputed that there were frequent changes in price, and uniformity has resulted not from maintaining the price at fixed levels, but from the prompt meeting of changes in prices by competing sellers.

It is urged by the defendants that such uniformity of price as existed in the trade was due to competition. They offered much evidence tending to show complete independence of judgment and of action of defendants, by large expenditures in competitive sales efforts and by variations in the volume of their production and shipment, earnings and profits. A great volume of testimony was also given by distinguished economists in support of the thesis that, in the case of a standardized product sold wholesale to fully informed professional buyers, as were the dealers in cement, uniformity of price will inevitably result from active, free and unrestrained competition; and the Government in its brief concedes that " undoubtedly

the price of cement would approach uniformity in a normal market in the absence of all combinations between the manufacturers."

We realize also that uniformity of price may be the result of agreement or understanding, and that an artificial price level not related to the supply and demand of a given commodity may be evidence from which such agreement or understanding, or some concerted action of sellers operating to restrain commerce, may be inferred. But here the Government does not rely upon agreement or understanding, and this record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement to which we have referred; and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action.

For reasons stated in *Maple Flooring Association* v. *United States, supra,* such activities are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act.

*The judgment of the District Court is reversed.*

The CHIEF JUSTICE and MR. JUSTICE SANFORD, and MR. JUSTICE MCREYNOLDS in a separate opinion, dissented from the opinions of the majority in this case and the case next preceding. See *ante,* pp. 586, 587.