## UNITED STATES v. CENTRAL SUPPLY ASS'N et al.
### No. 16750.

District Court, N. D. Ohio, E. D.
March 31, 1947.

Edward P. Hodges, Allen A. Dobey, Richard K. Decker, W. Wallace Kirkpatrick and John H. D. Wigger, Sp. Assts. to the Atty. Gen., Don C. Miller, U. S. Atty. and John J. Kane, Asst. U. S. Atty., both of Cleveland, Ohio, for the United States.

Howard F. Burns, G. Warren Daane, Richard F. Stevens and Baker, Hostetler & Patterson, all of Cleveland, Ohio, for American Institute of Wholesale Plumbing & Heating Supply Ass'ns and others.

James G. Moore, of New York City, for Jobbers Credit Ass'n, Inc.

Depew C. Freer, of Cleveland, Ohio, for Wholesale Distributors Ass'n of Texas.

Norman Gutfeld and Benesch, Friedlander & Morris, all of Cleveland, Ohio, for Manufacturers Clearing House of Illinois, Inc.

Luther Day, Thomas O. Nevison, Harold C. Lumb, and Jones, Day, Cockley & Reavis, all of Cleveland, Ohio, Edward H. Green, Inzer B. Wyatt, Henry N. Ess, III and Sullivan & Cromwell, all of New York City, for American Radiator & Standard Sanitary Corporation and others.

George B. Harris of Cleveland, Ohio, and Edward R. Johnston, Edward H. Hatton and Poppenhusen, Johnston, Thompson & Raymond, all of Chicago, Ill., for Crane Co.

Ashley M. Van Duzer, Thomas V. Koykka, Sumner Canary and McKeehan, Merrick, Arter & Stewart and George William Cottrell, all of Cleveland, Ohio, and Lucius P. Chase, of Kohler, Wis., for Kohler Co.

Ray T. Miller, John H. Ritter and Miller & Hornbeck, all of Cleveland, Ohio, and T. B. McGrath, of Chicago, Ill., for Sloan Valve Co.

Harold H. Gorman, Raymond L. Davis, Frederick C. Troll and Krueger, Gorman & Davis, all of Cleveland, Ohio, for Eagle-Picher Sales Co.

Charles W. Sellers, R. M. MacArthur, Barring Coughlin and Thompson, Hine & Flory, all of Cleveland, Ohio, for National Ass'n of Master Plumbers of the United States and others.

Parker Fulton, Harley J. McNeal and Burgess, Fulton & Fullmer, all of Cleveland, Ohio, and Martin O'Donoghue and O'Donoghue, Dunn & Mills, all of Washington, D. C., for United Ass'n of Journeymen Plumbers and Steamfitters of the United States and Canada and others.

WILKIN, District Judge.

### Preliminary Statement.

The indictment in this case was returned March 29, 1940. It charged a conspiracy to violate Section 1 of the Sherman Act, Title 15 U.S.C.A. § 1. It named 102 defendants and 115 co-conspirators. Preliminary proceedings were disposed of in 1940 and 1941. Three opinions have already been published: D.C., 34 F.Supp. 241; D.C., 37 F.Supp. 890; D.C., 40 F.Supp. 964.

When the case was ready for trial the country was involved in World War II. Many of the parties and counsel were engaged in war work or military service. The defendant manufacturers converted their plants to war production and the War Department asked a continuance of the case until after termination of hostilities. After peace was restored and counsel had returned to their former professional positions the case was set down for trial early in the autumn of 1946. In the interim, however, nine defendants had died. A separation and continuance was granted as to L. U. Noland, and sixteen defendants entered pleas of nolo contendere, and fines were imposed and paid. Trial began on November 18, there being at that time 76 defendants represented by 35 counsel. Trial continued at the rate of five hours a day, five days a week, with adjournments for holidays, until Friday, February 28.

When the Government rested, the defendants filed motions for judgments of acquittal under Rule 29, Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687. Arguments on such motions began on March 6 and ended on March 24. Said motions questioned the sufficiency of the evidence as a whole to sustain the indictment and also the sufficiency of the evidence as to each defendant. The defendants combined for the presentation of the motions attacking the sufficiency of the evidence generally, Mr. Day and Mr. Johnston making the principal argument, which was supplemented only by brief comments of other counsel. Such general argument was followed by separate arguments in support of the motions which questioned the sufficiency of the evidence as to each separate defendant. Counsel for the Government replied first to the overall motion and then analyzed the evidence as to each separate defendant. Counsel were diligent and painstaking in their analysis of the evidence as a whole and its application to the separate defendants. Reference is made to the transcript of their arguments and the court will not attempt a detailed discussion of the voluminous record of testimony and exhibits.

### Part I.

The court will proceed in the order adopted by counsel and consider first the motion which asserts that the evidence as a whole is insufficient to warrant submission of the case to a jury. This overall motion was based on two main assertions:

(1) The evidence is insufficient to sustain a conviction of the offense charged.

(2) There is a material and fatal variance between the charge in the indictment and the evidence offered by the Government, in that the indictment charges a single conspiracy, whereas the evidence offered by the Government—if it tends to prove any conspiracy at all—tends to prove separate, independent and isolated conspiracies completely unrelated to the conspiracy charged.

As to No. 1, the defendants insist that judgment of acquittal should be granted unless there is evidence which excludes every other hypothesis except that of guilt. They insist that the conduct of defendants

as revealed by the evidence was legal and therefore precludes any hypothesis of guilt.

As to No. 2, they rely mainly on the principles announced in the Kotteakos case (Kotteakos v. United States), 328 U.S. 750, 66 S.Ct. 1239, 1241. It is admitted that the defendants in this case, as in the Kotteakos case, were indicted for "a single general conspiracy". It was agreed that the indictment charged a conspiracy national in effect, involving four strata of the plumbing industry: the manufacturers, the jobbers (wholesalers), the master plumbers (retailers), and the journeymen plumbers (unions). The defendants claim that the indictment charged a conspiracy both horizontal and vertical in operation, but that the evidence fails completely to show such a vertical conspiracy. They maintain that if the evidence tends to show any conspiratorial conduct, it would tend to show merely a conspiracy among the members of each stratum of the industry or among members of only two strata of the industry. They insist that there is no evidence of agreement, combination, or concert between the manufacturers and the unions, or between the manufacturers and the master plumbers, or between the jobbers and the unions. They contend that if the evidence reveals cooperative efforts between jobbers and manufacturers, on one hand, jobbers and master plumbers, on the other hand, and contracts between master plumbers and local unions, still all such activity falls far short of the overall conspiracy described in the indictment.

Counsel for the Government, however, contend that the evidence reveals that since 1929 the defendants and the co-conspirators have been continuously engaged in a wrongful and unlawful combination and conspiracy in restraint of interstate trade by concerted efforts to channelize plumbing supplies in a "restricted system of distribution" (i. e., manufacturer to jobber, jobber to master plumber, master plumber to consumer and installed by union journeymen). While the evidence has necessarily been presented piecemeal and reveals for the most part the conduct of the separate defendants and co-conspirators, yet they contend that when it is considered altogether it reveals a course of conduct from which the only reasonable inference is that the defendants and co-conspirators arbitrarily agreed, with respect to all plumbing supplies, to sell, to purchase, to distribute, to supply and to install only under the "restricted system of distribution", and to boycott, to blacklist, to discriminate against, to coerce, to refuse to sell plumbing supplies to, and to refuse to supply labor to "any person who would not agree to follow the artificial and uncompetitive terms and conditions of the restricted system of distribution".

Counsel for the defendants take up the simile of the wheel which was used in the Kotteakos case and say that whereas the alleged conspiracy in that case was without a common rim, the conduct alleged to be a conspiracy in this case lacked both a common rim and a common hub. Counsel for the Government, however, borrow the simile of a chain, as portrayed in Government's Exhibit 1285, and insist that the concerted efforts on the various levels of the industry were linked together by concerted efforts between the respective levels through conferences, joint committees, and the American Institute, and that while there may be no evidence of direct contact between the end links of the chain, such as manufacturers and unions, yet a common purpose and knowledge as to what was taking place on all levels bound all into one combination or conspiracy.

Points 1 and 2 will be considered together —they can hardly be separated. A careful consideration of all the evidence and the authorities brings this court to the conclusion that the principles announced in the Kotteakos case are controlling in this case.

In the first place, a consideration of all the facts and circumstances convinces the court that the evidence tends to prove a number of separate conspiracies rather than one general conspiracy. The testimony and the exhibits cluster mainly around the various jobber associations, such as the Central Supply Association of Chicago, Plumbing & Heating Wholesalers of New England, Southern Wholesalers Association, Wholesale Distributors of Texas, and Jobbers Credit Association of New York. There is evidence of cooperation among these associations. They published lists of mem-

bers and names of those who adhered and of those who did not adhere to the "restricted system". They were organized for the same purpose in their various territories and they exchanged ideas, experiences and information. Officers of these associations met in conferences, served on joint committees, and attended meetings of associations other than those of which they were officers, and invited manufacturers and officers of the master plumbers associations to their meetings. Officers of certain defendant manufacturers served as officers of the jobber associations.

■ Counsel for the Government insist that the only reasonable inference from all these facts and circumstances is an agreement or understanding, but the evidence falls short of proving such a general combination as is charged in the indictment. The defendant manufacturers whose officers served as officers of the jobber associations were not only manufacturers but also jobbers. The cooperative efforts of the various defendants and co-conspirators may be accounted for as the natural result of their position in the industry and their common concern for the competition of the chain stores and D-T-U houses. The evidence as to agreement between jobber associations and manufacturers or between jobber associations and master plumbers seems on careful examination to have been mere expression of hope or opinions of what might have been rather than statements of what was. Speeches at conventions upon which no definite action was taken are not proof of contract, combination, or conspiracy. The evidence tends to prove the possibility of such combination or conspiracy. Counsel for the Government would have the court find such a conspiracy from the possibility and the course of conduct of the various defendants. But as counsel for the defendants insist, the conduct can be accounted for just as reasonably by consideration of the place, interest and long-established practice of the separate defendants. It was contended, indeed, that such an overall agreement, embracing such diverse elements, would be impossible in the very nature of the case.

There is no evidence of a contract or combination between the jobber associations and the unions and no evidence from which such contract might be inferred. The jobber associations were interested in a certain method of distribution. The plumbers' unions were interested in excluding from plumbing work all those who did not belong to their unions. The result of their contracts with their employers, the master plumbers, especially when such agreements were closed-shop contracts, was to channelize plumbing goods through the master plumbers to the exclusion of others who did not adhere to the "restricted system of distribution". But it can hardly be said that there was a common purpose between the jobber associations and the members of the unions. If an understanding or combination should be inferred between the jobbers and the master plumbers because of a common interest and purpose, there still would be no basis for such an inference as between the jobbers and the journeymen plumbers.

When we come to consider the master plumber associations, there is less to unite them with one another. They operated very much as separate local units, especially in their contracts with journeymen plumbers. The by-laws, rules, and regulations fail to reveal any responsibility of the National Association of Master Plumbers for the acts of the local associations, and the evidence discloses no actual participation in local activities.

■ The same situation exists with reference to the unions. The United Association of Journeymen Plumbers and Steam Fitters of the United States and Canada, referred to as "United Association", did not authorize or ratify the acts of the local unions. There is evidence that refutes such an assertion. The activity of the separate journeymen unions at Racine, Detroit, South Bend, Cleveland, Miami, Greensboro, Chicago, Canton, Youngstown, and Grand Rapids, even if it is conceded to be unlawful because tending to restrain trade beyond the extent permitted to unions in regard to labor contracts, still there is no evidence that connects the "United Association" with such activities, and no satisfactory evidence of association or combination with any other branch of the plumbing industry except their local employers, the master plumbers.

United Bro. of Carpenters and Joiners of America v. United States, 67 S.Ct. 775.

Even if it should be conceded that there was evidence of a conspiracy among the manufacturers, among the jobbers, among the master plumbers, and among the journeymen plumbers (unions), and if it should be conceded, moreover, that there was a conspiratorial link between the manufacturers and the jobbers, between the jobbers and the master plumbers, and between the master plumbers and the unions, still it would not follow that there was such an overall conspiracy as is described in the indictment, because there is no evidence of any conspiratorial link between the manufacturers and the unions. Both ends of the chain are open. They should be connected to complete a conspiratorial ring.

As was stated in the Kotteakos case, the law does not "authorize the Government to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be". If reference to "recognized manufacturers" in a local contract is construed as knowledge on the part of the local union, that is not enough. The only evidence of contact between plumbers and manufacturers was found in the McGinty letter (Exhibit 293) and the following correspondence. Neither McGinty nor the local union was named as a defendant or co-conspirator, and the correspondence fails to show a contract, combination, or conspiracy. It reveals no "partnership in crime". It does show knowledge on the part of the American Radiator & Standard Sanitary Corporation as to the activities of the local union. But the action of that corporation and its officers was not unlawful and was nothing more than might be expected in the circumstances. It does not preclude every hypothesis except that of guilt. On the contrary, it supports no hypothesis of guilt, unless it be assumed that it was unlawful in the circumstances for a manufacturer to confine his sales to jobber-wholesalers.

Such an assumption seems to be the basis of the indictment and all the arguments in support of it. The Government's contention seems to be founded on the assumption that any common activity or concert of effort by those interested in the distribution of plumbing goods through the wholesaler, as opposed to the chain store or DTU system of distribution, was a violation of the Sherman Act and that therefore anyone who did anything in furtherance of that common activity or coordination of effort became a party to a contract, combination, or conspiracy and that each participant was responsible for the acts of every other participant.

Counsel for the Government conceded that every manufacturer and jobber had a clear right to choose the person to whom he would sell and from whom he would buy, so long as he acted individually. But it is contended that the moment they drew together to stimulate a uniformity of individual action, they violated the provisions of the Sherman Act. That assumption overlooks the fact that the competition of the chain stores and Direct-to-You dealers would itself force manufacturers, jobbers, and master plumbers into a pattern of conduct necessary to meet such competition. The similarity of activities in various parts of the country would then not necessarily be proof of a contract, combination, or conspiracy. Asgill v. United States, 4 Cir., 60 F.2d 785; United States v. Armour, D.C., 48 F.Supp. 801; Aetna Portland Cement Co. v. Federal Trade Commission, 7 Cir., 157 F.2d 533, 558. Furthermore, the assumption overlooks the right of men of a common interest to assemble and form associations for the consideration and protection of their economic interests. Such right of tradesmen is the corresponding right of unions to do collective bargaining. Such right of association for the maintenance of proper standards and practices is recognized in the reported cases. Maple Flooring Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093; Cement Mfrs. Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104; Appalachian Coals, Inc., v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825. Furthermore, such right has acquired such general acceptance that we find it asserted in various statements of fundamental rights which have recently been submitted to the United Nations Organization for adoption as a part of the established international law of the

world. "International Conciliation", No. 426, p. 562, Art. 9.

To deny such right of assembly and association for the purpose of education as to proper business practices and standards of trade would work against the very purpose of the Sherman Act. The Sherman Act is founded upon the historic and economic truth that men benefit from trade and commerce. "It is in exchanging the gifts of the earth that you shall find abundance and be satisfied." The theory and letter of the Sherman Act are against monopolies, combination, and conspiracies that restrain such trade. Men should therefore be encouraged to do all they can to keep open the courses of trade, so long as their efforts are based upon persuasion and not coercion, so long as they are rational and not arbitrary.

It is to be observed in this case that the efforts of the defendants and co-conspirators were directed toward the preservation of the old system of distribution through wholesalers, upon whom retailers depended for supplies. If the local retailer and the wholesaler could not assemble and consider their common interests; if, on the other hand, they had to remain isolated and meet the competition of the chain stores singly, they would be forced out of business and the chain stores would grow into monopolies contrary to the very purpose of the Sherman Act.

Counsel for the Government stated that they did not champion one system of distribution as against another but acknowledged that it was the purpose of the law to keep free the courses of trade so that the various systems could meet in open competition. It seems therefore that it must be conceded that there is a sphere within which men of a common interest in the wholesaler method of distributing plumbing goods can act for their common interest, so long as they act as free individuals and so long as their efforts are regulatory and not restrictive. It cannot be assumed that because there was a similarity of conduct among the various defendants and that because they assembled and discussed their common aims and interests there was a contract, combination, or conspiracy which imposed upon every one in the industry who adhered to the wholesaler system of distribution a responsibility for the acts of all others in the industry whose conduct furthered and protected that system of distribution or militated against the chain-store system.

■ Returning to the specific problem presented by the motions in this case, we see that there must be evidence of an over-all combination or conspiracy which precludes every hypothesis that such evidence reveals a lawful course of conduct. If such evidence supports the assumption that the activity was lawful, then there is a failure of proof and the motions should be sustained, for the reason set forth in point No. 1 above.

■ If the evidence tends to show conduct which was arbitrary or coercive, but that the group or association asserting such coercive and arbitrary power was merely local or sectional or in any other way less than the total conspiracy alleged, then there is a fatal variance between the indictment and the proof, and the motion would have to be sustained on point No. 2 above. As stated in the Kotteakos case, "Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group."

The Supreme Court recognized that "* * * Leeway there must be for such cases as the Berger situation and for others where proof may not accord with exact specifications in indictments. Otherwise criminal conspirators never could be brought to halt. But," the court continues, "if the practice here followed were to stand, we see nothing to prevent its extension to a dozen, a score, or more conspiracies and at the same time to scores of men involved, if at all, only separately in them. The dangers of transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place. Section 269 [28 U.S.C.A. § 391] had no purpose to go so far. The line must be drawn somewhere. Whether or not Berger marks the limit, for this sort of error and case, we are clear that it must lie somewhere between that case and this one."

In the case of Canella v. United States, 157 F.2d 470, 477, 478, the Ninth Circuit Court of Appeals held that a case with five conspiracies involving twelve persons was within the prohibition of the Kotteakos case. But our present case far exceeds the Kotteakos case in scope and in numbers.

## Part II.

In the second place, if the court's conclusion that the evidence tends to prove a number of separate conspiracies should be unwarranted, still the court would feel that the broad principles announced in the Kotteakos case should apply here and take the case from the consideration of the jury. Even if there should be evidence of a general conspiracy worthy of submission to the jury, still the number of subordinate conspiracies, the number of defendants and co-conspirators, the complexity of the issues, the limited applicability of the evidence (restricted to specific defendants), and the number of legal principles involved, sustain the conviction that the submission of such a case to the jury would violate the fundamental, individual and personal rights which the Kotteakos case so expressly recognizes and protects. It would be to extend mass trial to an extent which the Supreme Court has denounced.

True, the facts of the Kotteakos case presented a variance, and that decision is therefore direct and specific authority for the decision here only if this case shows a similar variance. But it seems quite clear to this court that the Supreme Court made a strong pronouncement, even if obiter dictum, against any extension of mass trial to the point where the fundamental rights of individual defendants are endangered. It took occasion to answer the argument for such mass trials which is based upon facility and economy.

"True, this may be inconvenient for prosecution. But our government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth."

The Supreme Court thus gave specific application to the fundamental truth which was recognized by Edmund Burke when he said: "I do not know the method of drawing up an indictment against a whole people." and by General O. M. Mitchell when he said: "I can't arraign before a court, civil or military, a whole brigade."

The historic right of a defendant to his "day in court" is diluted when he must share that day with numerous other defendants. The very physical limitations impose restrictions upon mass trial. The court rooms of this court are above the average in size. They were built before the vogue of streamline architecture and space economy. Yet the space in this court was not sufficient to allow parties and counsel the usual and customary access and convenience. The space within the rail was not even sufficient to accommodate counsel. Three tables were placed beyond the rail for use of counsel, and none of the parties defendant were afforded seats with their counsel. They occupied the benches at the rear of the court room which are usually reserved for the disinterested public. If all the defendants in this case had stood trial and each had retained his or its own counsel, there would not have been space in the court room for them all.

Counsel and parties in the case were very considerate, courteous, and cooperative. For that reason the trial progressed satisfactorily, although with some inconvenience. A number of defendants united in retaining counsel and in some instances one firm represented a great many defendants. This helped to bring the case within the space limitations. But such consideration and cooperation cannot eliminate or decrease the complications and difficulties attending the submission of the case to, and the consideration of the case by, the jury. These are some of the difficulties: the remembrance of testimony for so long a time as the trial of this case would take, the proper use of exhibits so numerous (1616), the application of the evidence to the defendants to whom it applies, the exclusion of evidence from defendants to whom it does not apply, the analysis and application of evidence according to classes, groups, and periods, the applicability

and effect of the National Industrial Recovery Act, 48 Stat. 195, the application and effect of the Robinson-Patman Price Discrimination Act, 15 U.S.C.A. §§ 13, 13a, 13b, 21a, the application and effect of acts and ordinances governing the installation of plumbing equipment, the application and effect of the statute of limitations, the determination of the responsibility of defendants for the respective acts of associations, corporations, members, officers, and co-conspirators, the differentiation of defendants where there is so much similarity in names, viz., supply associations, wholesale associations, master plumber associations, United Association, differentiation of manufacturers, jobbers, wholesalers, retailers, contractors, master plumbers, journeymen plumbers, labor committee, joint committee, American Institute.

When these difficulties are considered, together with the number of defendants and co-conspirators and the fact that evidence was received against members of the various associations even though unnamed as defendants or co-conspirators, the problem of sytematizing the evidence and the avoidance of any misuse or misapplication of evidence becomes almost insurmountable. The summation and charge in such a case if specific and thorough would be too long and complex, and if short and concise would be indefinite and incomplete. To believe that an ordinary jury could hold in mind the names and identities of all the defendants and segregate and classify all the different bits of evidence, requires a faith and confidence in the human intellect which experience does not support. Faith that the verdict in such a case would be rational and fair, would have to be based on a blind trust in ritual contrary to all experience of possibilities.

It was evidently knowledge of such considerations that prompted the court in the Kotteakos case to say: "Numbers are vitally important in trial, especially in criminal matters. Guilt with us remains individual and personal, even as respects conspiracies."

Social scientists have observed that while health is a matter of public concern, disease is individual and must be treated individually. So the law recognizes that while lawful conduct is a matter of public concern, crime is individual and must be treated individually. The recent Nuremberg trial, although it was prompted by crimes as numerous, as horrible, and as far-reaching as the world has ever known, joined together only twenty-four defendants, even though that trial was presided over by learned and experienced judges and not complicated by the limitations of an ordinary jury trial. There is somewhere an absolute limit to a criminal trial and the Supreme Court has plainly recognized that fact.

The court recognized that it is entirely proper to join defendants in a conspiracy case: "When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass."

Conspiracy presents no special problem "when the scheme charged is tight and the number involved small", but the court pointed out that " * * * as it is broadened to include more and more, in varying degrees of attachment to the confederation, the possibilities for miscarriage of justice to particular individuals become greater and greater. * * * The greater looseness generally allowed for specifying the offense and its details, for receiving proof, and generally in the conduct of the trial, becomes magnified as the numbers involved increase."

It seems clear that the Supreme Court has enjoined upon the trial court the duty to "safeguard each defendant individually, as far as possible, from loss of identity in the mass" not only in a case of variance between indictment and proof but in every case. This court declines, as did the Supreme Court, to define in advance the limit of mass trial, but in view of the principles and safeguards announced in the Kotteakos case, it is the opinion of this court that this case exceeds the limit.

Even the justices who dissented in the Kotteakos case recognized the general principles here relied on: "Whether injury results from the joinder of several conspiracies depends on the special circumstances of each case. Situations can easily be imagined where confusion on the part

of the jury is likely by reason of the sheer number of conspirators and the complexities of the facts which spell out the series of conspiracies. The evidence relating to one defendant may be used to convict another."

■ Some question might be raised as to the propriety of this consideration on a motion charging the insufficiency of the evidence but it seems to this court that if the evidence is hopelessly complex and confused, in view of the number of defendants and conspiracies charged and the legal problems involved, the court is justified in holding that the defendants are entitled to judgment of acquittal.

## Part III.

If the court's interpretation of the evidence in Part I of this opinion is correct, or if the court's interpretation of the law in Part II is correct, there is no reason for further consideration of the motions. No occasion for measuring the evidence as to each separate defendant would arise unless the motion as to the evidence as a whole should be overruled. Nevertheless the court will indicate briefly its view of the motions based on the insufficiency of the evidence as to each separate defendant.

When the motions came on for argument, counsel for the Government announced that they did not oppose the motions of the following defendants: Detroit Association of Master Plumbers; Greensboro Plumbing & Heating Contractors, Inc.; United Association of Journeymen Plumbers and Steam Fitters of the United States and Canada, Local Union No. 94; Howard Enold; Arthur S. Pettit; and Sam Poole. As to those defendants the motions are therefore sustained.

Also should be sustained the separate motions of some other defendants, such as Manufacturers Clearing House of Illinois, Inc.; Kohler Company; Sloan Valve Company; National Association of Master Plumbers of the United States; United Association of Journeymen Plumbers and Steam Fitters of the United States and Canada; and the individuals who were charged with what they had done as officers of such companies and associations.

It is the opinion of the court that the evidence against those separate defendants is insufficient, even if the motions to the evidence as a whole should be overruled. Manufacturers Clearing House of Illinois, Inc. was not engaged in the plumbing industry but in reporting on the credit standing and business activity of manufacturers generally. Every reasonable hypothesis supports the legality of its activity. Its services and the use made of them failed to reveal any conspiratorial conduct or intent. As to Kohler Company, the evidence reveals that its policy with reference to distribution had been adopted long before the period covered by the indictment and shows further not only that it did not combine or conspire with other manufacturers, jobbers, or master plumbers, but that it adhered to its policy quite independently of all other agencies and divisions of the industry. The evidence negatives expressly any combination with the unions. The Sloan Valve Company was not a member of any association of jobbers or others, and there is no evidence that its officers ever attended any meeting of such associations. It too had an old-established policy antedating the N.R.A. Its exchange of information with jobber associations and others can not be construed as conspiratorial activity. As to the National Association of Master Plumbers, and the "United Association", the evidence is held insufficient for the reasons indicated in Part I of this opinion.

Now as to the remainder of the defendants, if the Government's contention that the evidence supports the charge of overall combination or conspiracy should be sustained, and if it should be further concluded that the evidence is not too complex and confused for submission to the jury, then it would be the court's opinion that there is sufficient evidence against each to warrant the overruling of their separate motions. If the general conspiracy be assumed from the overall evidence, then all who are shown to have participated in such activities of the jobber associations as furthered the conspiracy; all who with knowledge of such activities contributed to or supported such associations; all who with knowledge of the conspiracy adopted prac-

536

tices or active sales campaigns which embraced correspondence and exchange with conspirators, such as jobbers and master plumbers and officers of their associations; and all who participated in the contracts or practices of the local master plumber associations and journeymen's unions with the purpose of supporting the objective of such conspiracy, should be held to their defense. The evidence against the different defendants is of course not the same in character or amount, in quantity or quality, but it would serve no good purpose at this time to discuss or weigh it in detail. If the case were submitted to the jury, then it would have to be analyzed and summarized. All the court need say now is that the evidence against each of the defendants, except those mentioned in paragraphs 2 and 3 of Part III, would be sufficient to prevail against their respective motions, if it were not for the opinions expressed in Parts I and II.

## Conclusion.

All the motions are sustained for considerations set forth in Parts I and II. Judgments of acquittal will be entered for all and each of the defendants.