GULLIVER'S PERIODICALS, LTD.,
et al., Plaintiffs,

v.

CHAS. LEVY CIRCULATING CO., et
al., Defendants.

No. 77 C 547.

United States District Court,
N.D. Illinois, E.D.

June 3, 1981.

George W. Hamman, Jill Nickerson, Marvin N. Benn, Keith C. McDole, Kirkland & Ellis, Don H. Reuben, Thomas F. Ging, Roger B. Harris, Susan Henderson, Altheimer & Gray, Chicago, Ill., John M. Hadlock, Whitman & Ransom, New York City, Wilber H. Boies, McDermott, Will & Emery, Chicago, Ill., for plaintiffs.

Frederic J. Artwick, Thomas H. Morsch, Gerald L. Angst, Sidley & Austin, Earl E. Pollock, Sonnenschein, Carlin, Nath & Rosenthal, Duane C. Quaini, Bergstrom, David & Olson, Chicago, Ill., for defendants.

MEMORANDUM OPINION

GRADY, District Judge.

This case comes before the court on defendants' joint motion for summary judgment. (A number of defendants have pre-

viously been voluntarily dismissed from this case.) There are no disputes of material fact; for reasons discussed below, we grant defendants' motion for summary judgment.

## FACTS

The plaintiffs are an aspiring newspaper and periodical distributor (Gulliver's Periodicals, Inc.) and a newspaper and periodical retailer (Bob's News Emporium) in Chicago. Both are owned by the same person, Mr. Robert Katzman. Gulliver's has been attempting to break into the newspaper and periodical distribution market in Chicago, with only moderate success. Ninety to 95 per cent of the market is allegedly controlled by former defendant Chas. Levy Circulating Co. Gulliver's has been able to compete only by obtaining periodicals at greater expense from a distributor in Hammond, Indiana. Plaintiff Bob's News Emporium ("Bob's") has been dealing with Chas. Levy for some time. However, when Bob's began to obtain some periodicals from Gulliver's, Levy started distributing other periodicals to Bob's in a manner which has caused greater expense for Bob's than for other Levy retailers.

The defendants remaining in this case are the newspaper and periodical publishers who sell to distributors such as Levy. Gulliver's has unsuccessfully attempted to induce these publishers to deal with Gulliver's as a distributor and Bob's has attempted to induce them to deal with it directly; the publishers have individually told Gulliver's and Bob's that if they dealt with plaintiffs they would jeopardize their relationship with Levy; and none of them, apparently, are willing to do this.

The plaintiffs allege:

(1) that the refusal by all the publishers to deal with Gulliver's or with Bob's directly, is a group boycott, or combination or conspiracy in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

(2) that the refusal by all the publishers to deal with either of the plaintiffs has allowed Levy to maintain a monopoly and has resulted in decreased competition and increased, non-competitive prices in violation of Section 2 of the Sherman Antitrust Act.[1]

In support of their allegations, plaintiffs present the following evidence from which the jury is to infer a conspiracy in violation of Section 1:

(a) Defendants exchange information on all aspects of their distribution in Chicago, except for retail and wholesale prices, through a "rep room" maintained by Levy; and that such information is very valuable to the defendants.

(b) All the defendants responded negatively to Gulliver's offers to distribute their magazines or periodicals, which offers were made at a convention in Las Vegas and during various meetings of Katzman and publishers' representatives in Chicago.

(c) all the defendants have refused to deal directly with Bob's.

The publishing defendants concede that they do not deal with the plaintiffs. However, they argue that

(a) the plaintiffs have never made a "firm demand" upon any of the defendants to deal with them;

(b) there was no concerted conduct or agreement among the defendants to not deal with, or to boycott the plaintiffs;

(c) Bob's, as a third party to the course of dealing between Levy and the publishing defendants, has no standing to sue the defendants under the rule of *Illinois Brick Co. v. Illinois,* 431 U.S. 720, 97 S.Ct. 2061, 52 L.Ed.2d 707 (1977).

No affidavits have been filed in regard to this motion. However, extensive depositions are on file, and they may be con-

---

1. We do not read this portion of the complaint as asserting an action under § 2 of the Sherman Act. Rather, we interpret this section as claiming a violation of § 1 by means of a conspiracy to restrain trade by facilitating an illegal monopoly.

sidered by the court on a motion for summary judgment. *Samuels v. Doctors Hospital, Inc.,* 588 F.2d 485 (5th Cir.1979); *Perma Research & Development Co. v. Singer Co.,* 410 F.2d 572 (2nd Cir.1969); 6 Moore's Federal Practice, ¶ 56.11[4] at 56–277.

DISCUSSION

■ We note at the outset that plaintiff Bob's has standing to sue the publishing defendants. Although *Illinois Brick* would preclude Bob's from suing the publishers if the basis of its cause of action was a conspiracy by the publishers to drive up the prices of magazines at the wholesale level, which cost increase was then passed on by Levy to the retailers like Bob's, we do not understand this to be the basis of Bob's action. We read the complaint as alleging a group boycott by the publishing defendants in refusing to deal with Bob's directly. For the purposes of this motion, we will consider that Bob's cause of action is of the same nature as one asserted by Gulliver's.

■ Concerted refusals to deal, or "group boycotts," are *per se* illegal under § 1 of the Sherman Antitrust Act. 15 U.S.C. § 1; *Klor's, Inc. v. Broadway Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); *Fashion Originators Guild of America v. F.T.C.,* 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949 (1941). The elements of an action alleging a concerted refusal to deal are: (a) a firm demand made by the plaintiff to deal with the defendants and subsequent refusal by the defendants to deal with plaintiff; and (b) evidence of a conspiracy, concerted decision or agreement by the defendants not to deal with the plaintiff. *Cleary v. National Distillers & Chemical Corp.,* 505 F.2d 695 (9th Cir.1974). See also *Klors, Inc.* Both elements must be proven.

Defendants argue in this case that the conversations at the Las Vegas convention did not amount to a "firm demand and refusal," particularly since plaintiff failed to make any follow-up requests to do business with the defendants after the convention. Although we find from plaintiff's owner's deposition (Dep. Katzman) that his conduct was somewhat different with regard to each publisher's representative, we need not address the question of whether there was ever a "firm demand," followed by a "refusal," since we find that plaintiffs have failed to present sufficient evidence to support an inference or finding of conspiracy or concerted action by the defendants in refusing to deal with plaintiffs.

■ Mere refusal by a group of defendants to deal with a plaintiff is not itself sufficient evidence of conspiracy or concerted conduct. There must, at minimum, be proof of some "joint collaborative action" by the defendants in order to satisfy the "agreement" element of the Sherman Act. *United States v. General Motors Corp.,* 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). In other words, the plaintiff must prove that the defendants affirmatively agreed among themselves not to deal with the plaintiff. *See, e.g., First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 280, 88 S.Ct. 1575, 1588, 20 L.Ed.2d 569 (1968); *Silver v. New York Stock Exchange,* 373 U.S. 341, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963).

■ Plaintiffs here have failed to present any evidence from which a jury could infer an agreement among the defendants. *See General Motors Corp.* There is no evidence of any meetings, conversations, memoranda, or enforcement mechanism from which a jury could find even a tacit agreement among the defendants to jointly preclude plaintiffs from the periodical distribution market presently controlled by Levy. *Compare Eastern States Retail Lumber Dealers' Assoc. v. United States,* 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); *Radiant Burners, Inc. v. Peoples Gas Light & Coke Co.,* 364 U.S. 656, 81 S.Ct. 365, 5 L.Ed.2d 358 (1961); *First National Bank v. Cities Service,* 391 U.S. at 284–88, 88 S.Ct. at 1590–92; *Interstate Circuit, Inc. v. United States,* 306 U.S. 208, 216 n. 3, 221–26, 59 S.Ct. 467, 469 n. 3, 472–74, 83 L.Ed. 610 (1939). Nor does plaintiff submit any evidence which would allow the jury to find there was some sort of "exclusive dealing" arrangement between Levy and each or any of the defendants. *See, e.g., Standard Fashion Co. v.*

*Magrane-Houston Co.,* 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922).[2]

Mr. Katzman argues that the similarity and uniformity of the answers he received from the defendants' representatives, and the exchange of information at the "rep room" maintained by Levy, are sufficient evidence from which a jury could infer a conspiracy to boycott plaintiff Gulliver's. We disagree. In the absence of any other evidence of an agreement, the similarity of the answers received by Mr. Katzman from the defendants indicates at most that all the defendants had similar business concerns in the distribution of their products in Chicago. Unilateral, albeit parallel, conduct is not a violation of the antitrust laws.

■ Nor do we find that the mere exchange of information in the "rep room" constitutes evidence from which a jury could infer a conspiracy to boycott plaintiffs. First, we are unable to conclude that the information exchanged was in violation of the antitrust laws. It is undisputed that no "pricing" information was exchanged. Not all exchanges of information violate § 1 of the Sherman Act. If there is no evidence that the exchange of information had a restraining effect on competition, or that the defendants intended it to have such effect, there is no violation of § 1. *See Tag Manufacturers Institute v. F.T.C.,* 174 F.2d 452 (1st Cir.1949). Plaintiff presents no evidence that the information exchanged—information on wholesale and retail distribution locale and amount—was used for or had the effect of stabilizing production or prices, establishing a mechanism for controlling supply, setting quotas, or otherwise imposed unreasonable restraints on publication and distribution of newspapers and periodicals in Chicago. *Compare Fashion Originators Guild; American Column & Lumber Co. v. United States,* 257 U.S. 377, 42 S.Ct. 114, 66 L.Ed. 284 (1921); *Sugar Institute, Inc. v. United States,* 297 U.S. 553, 56 S.Ct. 629, 80 L.Ed. 859 (1936); *with Cement Manufacturers Protective Association v. United States,* 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925). We find in this case, as the Supreme Court did in *Cement Manufacturers,* 268 U.S. at 606, 45 S.Ct. at 592, that "[P]laintiff does not rely upon agreement or understanding, and this record wholly fails to establish, either directly or by inference, any concerted action other than that involved in the gathering and dissemination of pertinent information with respect to the sale and distribution of cement . . . and it fails to show any effect on price and production except such as would naturally flow from the dissemination of that information in the trade and its natural influence on individual action . . . [S]uch activities are not in themselves unlawful restraints upon commerce and are not prohibited by the Sherman Act." *See also Maple Flooring Manufacturer's Association v. United States,* 268 U.S. 563, 45 S.Ct. 578, 69 L.Ed. 1093 (1925).

Second, plaintiffs fail to show how the exchange of this particular information facilitates or would otherwise allow a jury to conclude that there was an agreement to boycott plaintiffs. At most, plaintiffs can argue that defendants have an interest in maintaining Levy's monopoly so as to ensure that the information continues to flow, and that it is complete with regard to all major publishers distributing in the Chicago area. However, it is equally plausible that

**2.** Plaintiffs rely heavily upon the fact that almost all the refusals Katzman received in Las Vegas were based upon the reluctance of defendants to "jeopardize" their relationship with Levy. As we discuss, *infra,* in the absence of any other evidence of concerted action, this evidence may merely indicate unilateral, parallel conduct by the defendants based upon satisfaction with the distribution services provided by Levy. However, even if plaintiffs were able to establish that this response was the result of threats by Levy to break off relations with any defendant/publisher who dealt with another

distributor in Chicago, we would be unable to conclude that this was anything more than evidence of monopolistic conduct by Levy—and Levy is no longer a defendant in this case. Plaintiffs do not argue, and we express no opinion, that acquiescence to threats made by a third-party "monopolist" is sufficient to establish a scheme or conspiracy under the antitrust laws, either horizontally (among the publishing defendants) or vertically (between each defendant and Levy). *See First National Bank of Arizona,* 391 U.S. at 280 n. 16, 88 S.Ct. at 1588 n. 16.

if defendants were otherwise displeased with the distribution services provided by Levy, they could satisfy their desire for this information by establishing their own clearing house for the exchange of distribution figures, retail localities and retailer purchase figures. We express no opinion on whether the maintenance of such a "rep room" by Levy is evidence of monopolistic conduct; however, we fail to find any support for plaintiffs' apparent conclusion that mere patronage of a "monopolist" is a violation of the antitrust laws.

The defendants' motion for summary judgment is granted.