**FEDERAL TRADE COMMISSION,**
**Plaintiff,**

v.

**LUKENS STEEL COMPANY and United**
**States Steel Corporation, Defendants.**

Civ. A. No. 74–926.

United States District Court,
District of Columbia.

June 23, 1978.

---

R. Baylor Rowe, P. Abbott McCartney, and Joseph B. Pritti, Washington, D.C., for plaintiff F. T. C.

Edward W. Mullinix, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa. and James F. Mulligan, Gen. Counsel, Lukens Steel Co., Coatesville, Pa., for defendant Lukens Steel Co.

Dominic B. King, James P. Markle, William J. McKim and Philip J. Sheehe, Pittsburgh, Pa., admitted pro hac vice, for U. S. Steel Corp.

## MEMORANDUM

GASCH, District Judge.

In this action, the Federal Trade Commission (FTC) claims that Lukens Steel Company (Lukens) and the United States Steel Corporation (U.S. Steel) violated the cease and desist order issued by the FTC in *American Iron & Steel Institute*, 48 FTC 150 (1951). The FTC requests, pursuant to sections 5(*l*), 5(m), and 16(b) of the Federal Trade Commission Act (FTC Act), 15 U.S.C. §§ 45(*l*), 45(m), and 56(b) (1976), equitable relief and civil penalties [1] for violations of the order. This matter having been tried to the Court on October 13–27, 1977, the Court makes the following findings of fact and conclusions of law in accordance with Fed. R.Civ.P. 52(a).

## I. BACKGROUND.

### A. *Order.*

The order in *American Iron & Steel Institute*, 48 FTC 150 (1951), was issued on August 10, 1951 in settlement of a complaint filed by the FTC against over one hundred steel producers, including Lukens and U.S. Steel. The FTC alleged in the complaint that the steel producers fixed prices through, *inter alia*, the collusive use of a basing point pricing system and the American Iron and Steel Institute's compilation of pricing factors. The order, in pertinent part, prohibits the steel companies from:

> entering into any planned common course of action, understanding, or agreement between any two or more of said respondents, or between any one or more of said respondents and others not parties hereto, and from cooperating in, carrying out

---

1. In the complaint, the FTC requests the imposition of the maximum civil penalty that may be assessed under section 5(*l*) of the FTC Act, 15 U.S.C. § 45(*l*) (1976), $10,000 for each day the order was violated. The FTC seeks such a penalty for 1,298 days for the period from June 18, 1969, to February 8, 1973. If the Court imposed the maximum penalty, each defendant would be subject to a liability of approximately $13 million.

or continuing any such planned common course of action, understanding or agreement, to do or perform any of the following things:

(1) Adopting, establishing, fixing, or maintaining prices or any element thereof at which steel products shall be quoted or sold, including but not limited to base prices, the extras which shall be added to, or the deductions which shall be made from, any base price for any specified characteristic, or loading charge or delivery charge or terms of discount, credit, or other conditions of sale.

(2) Collecting, compiling, circulating, or exchanging between or among respondents, or any of them, a list or lists of base prices or of prices by any other designation, or extra charges thereto or deductions therefrom for any specified characteristic or quantity of steel products or services connected therewith used or to be used in computing prices or price quotations of steel products; or using, directly or indirectly, as a factor in computing price quotations or in making, quoting, or charging prices any such list or lists so collected, compiled, circulated, or exchanged.

     \*    \*   .   \*     \*     \*     \*

(4) Formulating, devising, adopting, establishing, fixing, or maintaining methods or practices of quoting and selling steel products to railroads or other particular classes of customers.

(5) Quoting or selling steel products at prices calculated or determined pursuant to, or in accordance with, any system or formula which produces identical price quotations or prices or delivered costs, or which establishes a fixed relationship among price quotations or prices or delivered costs, or which prevents purchasers from securing any advantage in price in dealing with one or more of the respondents as against any of the other respondents.

     \*    \*    \*     \*     \*     \*

II. . . . acting, individually or otherwise, so as knowingly to contribute to the maintenance or operation of any planned common course of action, understanding or agreement between and among any two or more of the respondents or between any one or more of them and others not parties hereto through the commission of any of the acts, practices or things prohibited by subparagraphs (1) through (6) of paragraph I of this order.

48 FTC at 152–54.

However, the order explicitly exempted certain types of conduct from its terms. It specifically provided that "evidence of uniformity of prices or any element thereof of two or more sellers at any destination or destinations alone and without more" would be insufficient to establish a violation of the order. 48 FTC at 154, III(1). The order also stated that the "Federal Trade Commission is not acting to prohibit or interfere with delivered pricing or freight absorption as such when innocently or independently pursued, regularly or otherwise, with the result of promoting competition." 48 FTC at 154, III(3).

### B. *Complaint.*

On June 18, 1974, the FTC filed this action against Lukens and U.S. Steel. Plaintiff claims that for at least the five years prior to the date the complaint was filed: [2]

[D]efendants, in connection with the offering for sale, sale and distribution in interstate commerce of HY–80 and HY–100, have been continuously, for each day of the aforementioned period, engaged in a planned common course of action, understanding or agreement with each other, with each other and with Newport, or each with Newport, to establish, fix, or maintain prices, including elements thereof such as delivery charges or other con-

---

**2.** The plaintiff's recovery is limited to violations occurring within the five years prior to the date of the complaint, June 18, 1974, because the five-year statute of limitations for civil penalty actions, 28 U.S.C. § 2462 (1970), is applicable. *See United States v. Ancorp National Services, Inc.,* 516 F.2d 198, 200 n.5 (2d Cir. 1975).

ditions of sale. Each defendant has also cooperated in, carried out, and contributed to the maintenance or operation of a planned common course of action, understanding or agreement, with each other, with each other and with Newport, or each with Newport, to establish, fix or maintain prices, delivery charges, or other conditions of sale, in a manner prohibited by the Federal Trade Commission's order in Docket 5508.

Complaint ¶ 9. Plaintiff contends that defendants' behavior in connection with the submission of bids to Newport News Shipbuilding and Dry Dock Company for the sale of HY–80 and HY–100 steel plates specifically violated Paragraphs I(1), (2), (4), (5), and II of the order.

C. *HY–80 and HY–100 Steel Plate Industry.*

The alleged violations of the order arose solely in connection with the submission of bids by Lukens and U.S. Steel for the sale of HY–80 and HY–100 steel plates to Newport News Shipbuilding and Dry Dock Company, a prime contractor of the Government. HY–80 and HY–100 steel plates (HY-steel plates) are highly specialized, special treatment premium quality alloy steel plates used primarily in the construction of combat vessels for the United States Navy.[3] HY-steel plates are produced according to specifications established by the Navy, and only steel producers certified by the Navy are permitted to produce HY-steel plates for use in Navy vessels. U.S. Steel, Lukens, Armco Steel Corporation (Armco), and Bethlehem Steel Corporation (Bethlehem) were qualified producers during the period of the alleged violations.[4]

Newport News Shipbuilding and Dry Dock Corporation (Newport News), a Virginia corporation with principal offices, place of business, and shipyards in Newport News, Virginia, is engaged in the construction of combat vessels for the Navy. During the period relevant to this case, Newport News subcontracted with both Lukens and U.S. Steel for HY-steel plates for use in ship construction pursuant to prime contracts with the Navy. Newport News purchased substantial quantities of HY-steel plates from Lukens and U.S. Steel during this period,[5] of which a significant amount was used in the construction of the U.S.S. Nimitz and U.S.S. Eisenhower, two nuclear powered aircraft carriers.

The Navy and Newport News entered into fixed price incentive contracts during this period. It is important to note that under this type of contract, the Navy assumed the entire target or projected cost. If the total cost exceeded the target cost, then the additional cost was allocated between the Navy and the prime contractor according to a formula specified in each contract. If the total cost exceeded the target cost but not the ceiling price, the Navy bore the major portion of the cost; the prime contractor would be responsible for the entire amount by which the final cost exceeded the ceiling price. However, if the final cost was less than the target cost, a percentage of the difference between the two costs would be awarded to the prime contractor as additional profit. *See, e. g.,* Exh. 11A, at 49.

In awarding subcontracts, Newport News utilized a competitive bidding system. It solicited bids for HY-steel plates by sending invitations to bid, which set forth the sizes, shapes, and quantities of steel to be purchased, to Lukens, U.S. Steel, and, at times, to Armco and Bethlehem. In response, each interested bidder would submit a bid

---

**3.** "HY" stands for high yield; the number pertains to the number of pounds per square inch minimum yield strength.

**4.** The following mills were approved by the Navy: U.S. Steel's mills in Homestead, Pennsylvania, and Gary, Indiana; Lukens' mill in Coatesville, Pennsylvania; Armco's mill in Houston, Texas; and Bethlehem's mill in Burns Harbor, Indiana.

**5.** During this period, Lukens and U.S. Steel sold HY-steel plates to two other prime contractors of the federal government, Electric Boat Division of General Dynamics Corporation and Ingalls Shipbuilding Company of Litton Industries. Defendants also sold HY-steel plates to Defense Industrial Supply Center (DISC).

to Newport News. Newport News awarded purchase orders on the basis of the bids received; thus, the bids were crucial to the determination of the award of the contract. It was the practice of Newport News to award the bid to the lowest bidder. Indeed, if Newport News did award a contract to a supplier other than the lowest bidder, it would risk the possibility that the Navy might not reimburse it for the cost of the steel.

Several provisions in the prime contract as well as in the procurement regulations gave the Navy authority to review Newport News' procurement system and individual contracts and otherwise regulate Newport News' subcontracting practices. In particular, the "consent to subcontracts" clause in the prime contract specifically provided the Navy's Supervisor of Shipbuilding with authority to approve individual purchases and to evaluate the overall procurement system. *See, e. g.,* Exhs. 11A, at 102–04; 11B, at 31–32. Price competition was one of the factors the supervisor was required to consider. He was also required to consider cost and pricing data if there was inadequate evidence of, *inter alia,* competition among the suppliers bidding on the subcontract or an established commercial position for the sale price of the product. The prime contracts obligated Newport News to provide cost and pricing data to the Navy.[6] *See, e. g.,* Exhs. 11A, at 115–16; 11B, at 32. In addition, a "competition in subcontracting" clause required Newport News to employ a competitive bidding procedure for subcontracts. *See* Exhs. 11C, at 49; 11D, at 43; 10 U.S.C. § 2304 (1970).

D. *Status of the Case.*

On June 30, 1976, United States Magistrate Lawrence S. Margolis, acting as a Special Master pursuant to Fed.R.Civ.P. 53 and this Court's order of April 25, 1975, set forth Findings of Fact and Conclusions of Law on the threshold issue of whether the FTC's order in *American Iron and Steel Institute,* 48 FTC 150 (1951), covered HY-steel plates. The Special Master concluded that the HY-steel plates were "alloy steel plates" within the meaning of the order. The Court adopted the findings and conclusions of the Magistrate on February 17, 1977, and set the case for trial.

II. MERITS.

A. *Plaintiff's Allegations.*

The FTC claims that the evidence, when viewed as a whole, reveals a "planned common course of action" in violation of the order between defendants, among defendants and Newport News, and between Newport News and each defendant. The FTC relies on the following facts to support its claim: (1) Between 1968 and 1971, the bids submitted by U.S. Steel and Lukens to Newport News were identical most of the time when freight to Newport News was added. (2) Newport News divided the awards of HY-steel bids between U.S. Steel and Lukens on approximately a 55 to 45 percentage basis. (3) Newport News did not award Bethlehem any HY-steel orders, even though Bethlehem, at times, submitted identical bids. (4) A contracting officer for the Navy at Newport News withheld consent on several proposed bid awards. (5) On twenty-three occasions during the five-year period, Newport News, after U.S. Steel and Lukens had submitted bids, telephoned each defendant on the price of several different items in the bid, and defendants subsequently revised their prices, with the result that defendants' bids were identical when freight to Newport News was added. (6) U.S. Steel's quotations to Newport News were derived from an internal price schedule which was intended to be competitive with Lukens' published prices and specification components price list. (7) Lukens generally followed

---

6. Terry H. White, a contracting officer for the United States Navy at Newport News, testified that the Navy's consent to Newport News' projected purchase of HY-steel plates was withheld on several occasions. Tr. 43–44, 103. Mr. White concluded that, because of the iden-

ticality of bids, there was inadequate evidence of competition and cost and pricing data were therefore necessary. However, defendants U.S. Steel, Lukens, and Bethlehem refused to provide cost and pricing data.

the price changes of U.S. Steel. (8) Newport News provided U.S. Steel with information concerning Lukens' bidding. (9) Newport News, at times, advised one defendant of the other's price changes. (10) Newport News advised each defendant on a number of occasions that it must remain competitive in order to participate in the HY-steel business at Newport News. (11) When Armco submitted low bids, each defendant attempted to determine their expected participation rate.

Upon the basis of these and other facts, plaintiff requests the Court to draw the following inferences:

(1) Newport News facilitated price identicality at Newport News through a variety of communications with defendants. (2) When Newport News informed defendants that they must remain competitive and defendants responded that they intended to remain competitive, competitive meant the same price. (3) U.S. Steel used Lukens' price list as a formula from which it prepared bids to Newport News. (4) Each defendant participated in the bidding at Newport News with the understanding that each would receive a fixed percentage of the awards. (5) When invited to submit lower prices in exchange for increased participation at Newport News, the defendants declined, even though contrary to their own business interests, and continued to submit identical bids.

B. *Applicable Law.*

The legal standard to be applied in this case is set forth in the order, which prohibits the steel companies, *inter alia*:

I. . . . from entering into any planned common course of action, understanding, or agreement between any two or more of said respondents, or between any one or more of said respondents and others not parties hereto, and from cooperating in, carrying out or continuing any such planned common course of action, understanding or agreement to do or perform any of the following things:

(1) Adopting, establishing, fixing, or maintaining prices or any element thereof at which steel products shall be quoted or sold . . . ..

\* \* \* \* \* \*

II. . . . from acting, individually or otherwise, so as knowingly to contribute to the maintenance or operation of any planned common course of action, understanding or agreement between and among any two or more of the respondents or between any one or more of them and others not parties hereto through the commission of any of the acts, practices or things prohibited by subparagraphs (1) through (6) of paragraph I of this order.

148 FTC at 152–54. In other words, the order prohibits participation in a planned common course of action or knowing contribution to a planned common course of action. *See* Pretrial Statement for Lukens Steel Company at 2.

The consent order explicitly provides that "planned common course of action" be construed "as interpreted by the Supreme Court in *F.T.C. v. Cement Institute*, 333 U.S. 683, 68 S.Ct. 793, 92 L.Ed. 1010 and by the Court in *American Chain & Cable Co. v. F.T.C.* (C.A. 4th 1944), 139 F.2d 622." 48 FTC at 154. According to the Court in *FTC v. Cement Institute*, 333 U.S. at 728, 68 S.Ct. at 816, "planned common course of action"

. . . is merely an emphatic statement that the Commission is prohibiting concerted action—planned concerted action. The Commission chose a phrase perhaps more readily understood by businessmen than the accompanying legal words of like import.

In *American Chain & Cable Co. v. FTC*, 139 F.2d at 624, the court construed an order containing the same language in the following manner:

[T]o sustain a charge of violation of the order in this case it must be shown that the prohibited acts have been performed as the result of an agreement or conspir-

acy, or as the result of a common course of action, that has been agreed upon or planned between two or more persons. Thus, it is clear that, in order to establish a violation of the order, there must be proof of concerted action.

Section one of the Sherman Antitrust Act, 15 U.S.C. § 1 (1976), which prohibits contracts, combinations, and conspiracies in restraint of trade, requires proof of concerted action as well. As one commentator has stated, section one "presents a single concept about common action, not three separate ones: 'contract . . . combination or conspiracy' becomes an alliterative noun, roughly translated to mean 'concerted action.'" L. Sullivan, *Handbook of the Law of Antitrust* 312 (1977). Therefore, the Court is appropriately guided by cases arising under section one.[7]

It is well settled that concerted action may be established by circumstantial evidence. *See Norfolk Monument Co. v. Woodlawn Memorial Gardens, Inc.*, 394 U.S. 700, 704, 89 S.Ct. 1391, 22 L.Ed.2d 658 (1969); *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Neither direct evidence nor evidence of an express agreement is necessary. *See Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 221, 59 S.Ct. 467, 83 L.Ed. 610 (1939); *Eastern States Retail Lumber Dealers' Ass'n v. United States*, 234 U.S. 600, 612, 34 S.Ct. 951, 58 L.Ed. 1490 (1914).

An inference of concerted action is warranted where the totality of circumstances reveals a "unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *American Tobacco Co. v. United States*, 328 U.S. 781, 810, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946). In making this determination, a court must consider the evidence as a whole rather than view the papers and exhibits in isolation. *See C-O-Two Fire Equip. Co. v. United States*, 197 F.2d 489, 494 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952).

"Concerted action" may be inferred from evidence of parallel business behavior. However, as established in *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954) (footnote omitted), conscious parallelism alone is not sufficient to establish an antitrust conspiracy:

> [T]his Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.

The Court of Appeals for the Ninth Circuit articulated this view in more concrete terms:

> The mere fact that two or more of the defendants dealt with plaintiff in a substantially similar manner does not support an inference of conspiracy, even though each knew that the business behavior of another or the others was similar to its own. *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540–541, 74 S.Ct. 257, 98 L.Ed. 273 (1954). Like businesses are generally conducted alike and, as the trial judge correctly stated, similarity in operations lacks probative significance unless present "under circumstances which logically suggest joint agreement, as distinguished from individual action." See *Fox*

---

7. Only one additional issue pertaining to the specific terms in the order was raised. The order extends to "any planned common course of action, understanding, or agreement between any two or more of said respondents and others not parties hereto . . . ." Defendant Lukens contends that Newport News, a customer, is not within the meaning of "others not parties hereto." The Court finds this argument unpersuasive. The Supreme Court in *FTC v. Cement Institute*, 333 U.S. 683, 728, 68 S.Ct. 793, 817, 92 L.Ed. 1010 (1948), interpreted identical language to include "others outside the industry who are not parties to this proceeding."

*West Coast Theatres Corp. v. Paradise Theatre Bldg. Corp.*, 264 F.2d 602 (9th Cir. 1958).

*Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 661 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963). *See Joseph E. Seagram & Sons, Inc. v. Hawaii Oke Liquors, Ltd.*, 416 F.2d 71, 85 (9th Cir. 1969), *cert. denied*, 396 U.S. 1062, 90 S.Ct. 752, 24 L.Ed.2d 755 (1970).

■ Clearly, parallel pricing alone is insufficient to establish an antitrust violation. In fact, price identity may be the expected and normal result when the product is identical or fungible, even though there is no agreement and the costs for the participating companies are not the same. *See Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 605–06, 45 S.Ct. 586, 69 L.Ed. 1104 (1925);[8] *Independent Iron Works, Inc. v. United States Steel Corp.*, 322 F.2d 656, 665 (9th Cir.), *cert. denied*, 375 U.S. 922, 84 S.Ct. 267, 11 L.Ed.2d 165 (1963);[9] L. Sullivan, *Handbook of the Law of Antitrust* 318 (1977). Indeed, additional or "plus factors"[10] have been present in all parallel pricing cases in which an antitrust conspiracy has been found. *See, e.g., Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939).

Although the nature and extent of the "plus factors" necessary to warrant an inference of concerted action from evidence of parallel business behavior have not been precisely delineated, the Court of Appeals for the Third Circuit has recently set forth factors considered important in establishing such an inference. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 436 (3d Cir. 1977), *cert.*

*denied*, 434 U.S. 1086, 98 S.Ct. 1208, 55 L.Ed.2d 791 (1978); *Venzie Corp. v. United States General Products Co.*, 521 F.2d 1309, 1314–15 (3d Cir. 1975). First, there should be evidence that defendants acted contrary to their economic self-interest. Absent such evidence, parallel behavior would not necessarily be evidence of an agreement in violation of the antitrust laws, since the parallel action could have resulted from an independent individual decision. *See Venzie Corp. v. United States General Products Co.*, 521 F.2d at 1314, *citing* Turner, *The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal*, 75 Harv.L.Rev. 655, 681 (1962). Second, there should be evidence of defendants' motivation to enter into an agreement. The Court in *Bogosian v. Gulf Oil Corp.*, 561 F.2d at 446, stated that proof of these circumstances would "make the inference of rational, independent choice less attractive than that of concerted action."

The Third Circuit's analysis appears to distill accurately the pertinent case law. For example, the Court in *Theatre Enterprises, Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), focused upon facts evidencing rational, independent business reasons as an explanation for parallel conduct. *See C–O–Two Fire Equip. Co. v. United States*, 197 F.2d 489 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952). In *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 287, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Court, in discussing and distinguishing *Interstate Circuit, Inc. v. United States, supra*, emphasized the fact that all conspirators had the same motive to enter

---

8. A great volume of testimony was also given by distinguished economists in support of the thesis that, in the case of a standardized product sold wholesale to fully informed professional buyers, as were the dealers in cement, uniformity of price will inevitably result from active, free and unrestrained competition; and the Government in its brief concedes that "undoubtedly the price of cement would approach uniformity in a normal market in the absence of all combinations between the manufacturers."

268 U.S. at 605–06, 45 S.Ct. at 592.

9. Similarity of prices in the sale of standardized products such as the types of steel involved in this suit will not alone make out a prima facie case of collusive price fixing in violation of the Sherman Act, the reason being that competition will ordinarily cause one producer to charge about the same price that is charged by any other.

322 F.2d at 665.

10. *See C–O–Two Fire Equip. Co. v. United States*, 197 F.2d 489 (9th Cir.), *cert. denied*, 344 U.S. 892, 73 S.Ct. 211, 97 L.Ed. 690 (1952).

into an agreement. Another court has noted that an inference of concerted action is more likely where there are many co-conspirators within a non-oligopolistic industry. *See Delaware Valley Marine Supply Co. v. American Co.*, 297 F.2d 199 (3d Cir. 1961).

■ These cases, particularly *Bogosian v. Gulf Oil Corp., supra*, guide this Court in making the ultimate determination: Whether the evidence reveals conduct that could be explained by rational, independent business behavior or could only make sense in the context of the behavior of others. If the latter is true, and the behavior makes sense only if each defendant's competitors behave in a similar fashion, then the inference of concerted action is clearly warranted.[11]

### C. *Evaluation of the Evidence.*

The fundamental issue before the Court is whether concerted action can be inferred from the evidence of record. Indeed, the parties do not, for the most part, disagree over the facts but rather over the inferences to be drawn from the facts.

The FTC alleges that each defendant, in violation of the order, engaged in a common course of action with (1) the other; (2) the other and Newport News; and (3) Newport News in connection with the submission of HY-steel bids to Newport News. The Court therefore will address separately the charges against each alleged combination.

### 1. *Planned Common Course of Action between Lukens and U.S. Steel*

■ Only a part of the evidence of record pertains to the allegation of a two-party combination between defendants: Much of the evidence adduced by plaintiff relates only to the alleged three-party combination among defendants and Newport News. This evidence pertains to factual situations over which Newport News had control or played a significant role. For example, the division of bids between U.S. Steel and Lukens on a fifty-five to forty-five percent-

age basis could only be accomplished through the direction of Newport News. Similarly, Newport News was the central participant in the price corrections and limited communication of price information.

The Court will consider first the evidence pertaining only to the alleged two-party combination. Plaintiff relies on the following facts and inferences to support its claim against Lukens and U.S. Steel: U.S. Steel's withdrawal of its published price lists; U.S. Steel's use of Lukens' published price lists in developing a formula; Lukens' change in classification of HY-steel plates; and Lukens' practice of following U.S. Steel's price increases or decreases. The Court will analyze each of these facts and inferences seriatim.

A U.S. Steel official explained, in a memorandum summarizing the pricing policies over the years, that U.S. Steel withdrew its published price lists in response to investigations by the GAO and FTC of HY-steel procurement practices. U.S. Steel intended that this action would alleviate the problem of price identicality. *See* Exh. 194. Moreover, of the four qualified steel companies, only Lukens published HY-steel prices. Finally, there is no evidence that the motive for U.S. Steel's decision was to facilitate price-fixing or that it was based on joint action.

Even if the Court were to accept plaintiff's most extreme representation of the fact that U.S. Steel adjusted to Lukens' published price list in order to be competitive with Newport News, *i. e.*, that U.S. Steel used Lukens' prices to develop a formula, there is no evidence of any concerted action in regard to this practice. It does appear that U.S. Steel utilized an internal price list that reflected a price competitive with Lukens' prices. U.S. Steel received limited information from its customers, including Newport News, concerning the prices of Lukens, Bethlehem, and Armco. U.S. Steel's price at Newport News was

---

**11.** It is noted that in most of the cases discussed above, the courts were considering whether there was sufficient evidence merely to get the case to the jury rather than whether the evidence was sufficient to justify a finding for the plaintiff.

derived from the information on Lukens' price, adjusted for the difference in freight rates between Homestead, Pennsylvania and Newport News, Virginia and Coatesville, Pennsylvania and Newport News. However, U.S. Steel's attempts to determine Lukens' price seem to be individual action. Independent efforts to ascertain competitors' pricing were in its best interest, particularly since it knew that the awards at Newport News were made on the basis of the lowest bids. The evidence of U.S. Steel's adjustment for freight reveals nothing more than freight absorption independently pursued, which is expressly permitted by the order. The price sheets in U.S. Steel files, evidencing attempts by U.S. Steel employees to reconstruct Lukens' price lists, are further evidence that U.S. Steel's attempt to approximate Lukens' prices was independently pursued.

Lukens' decision in May, 1966 to change the classification of HY-steel plates also appears to be an independent decision. It apparently was an attempt by Lukens to resolve the problem of identical bids raised by the GAO investigation. See Tr. 328. The evidence does not reveal that Lukens' practice of following price increases or decreases announced by U.S. Steel was a product of concerted action. The changes that Lukens followed were often those adopted by the other major steel producers (Armco and Bethlehem) as well.

Plaintiff also focuses on the failure of the steel companies to submit cost and pricing data, as required by federal statute and the prime contract between the Navy and Newport News. The Court finds, however, that no inference can be based on this fact. First, there is no evidence that Lukens' or U.S. Steel's refusal to submit cost and pricing data was a product of concerted action. Indeed, Bethlehem also refused to submit such data. Lukens concluded that, because it published prices, it had sufficiently complied with the requirement. Although U.S. Steel objected to submitting such data to Newport News, a private customer, it informed the Navy that it would supply the Navy with the data on a confidential basis.

The FTC also alleges that defendants, contrary to their self-interest, failed to submit a lower bid in exchange for increased participation at Newport News. It first notes Newport News' invitation to U.S. Steel to bid on the remaining requirements for the U.S.S. Nimitz, if U.S. Steel would quote prices lower than Lukens' published prices. U.S. Steel contends that its decision not to quote lower prices reflects its judgment that quotation of lower prices would be unprofitable in light of its costs and profit objectives. This explanation is no less plausible than that which the FTC proposes. U.S. Steel further notes that this decision cannot be compared with its decision in May, 1972 to submit a bid to Electric Boat lower than Lukens' published price list: Because Newport News purchased black plates (plates that were not cleaned, painted, or ultrasonically tested), and Electric Boat bought finished plates (plates that were cleaned, painted, and ultrasonically tested), different cost structures and profit and pricing considerations were involved. The FTC failed to submit any concrete evidence, such as cost and pricing data, to support its claim that U.S. Steel's refusal to lower its bid at Newport News was contrary to its self-interest, and thus the plaintiff failed to sustain its burden of proof on this issue.

The FTC similarly alleges that Lukens declined to lower its bid in response to an invitation of Tenneco, Inc., Newport News' parent corporation, for the total 1972 HY-steel requirements. The evidence reveals that Tenneco invited bids on all or any portion of Tenneco's major component companies' requirements for all steel products. This offer was not made at a time when Lukens was experiencing depressed demand, as the FTC alleges, but rather was made during an average year for Lukens. Lukens found this offer unattractive for two reasons. First, Newport News' practice was to place numerous small orders, because it had limited storage facilities furnishing protection from the weather. Tenneco did not give Lukens any assurance that this method of placing orders would be changed. Second, Newport News bought

black (unfinished) plates; when the order was for finished plates, Lukens had an opportunity to make greater profit. Lukens reduced its existing prices on two occasions, one involving Defense Industrial Supply Center and the other involving Electric Boat, in order to secure a large procurement of HY-steel. Lukens, in explaining these incidents, noted the opportunity for greater profit. Moreover, the price reduction, rather than a one-shot effort to obtain a large order, applied to all existing and future orders. The Court therefore finds that Lukens' explanation is as likely as that offered by the FTC.

Plaintiff also alleges that there was direct exchange of information on price changes. Lukens did purchase from alloy producers, including U.S. Steel, and thus its purchasing department could receive some pricing information. Although Lukens received word of a price change from U.S. Steel through its purchasing department on three occasions, this information merely confirmed information previously received. Lukens usually obtained information on price changes through trade journals or its customers. There is no evidence of any price discussions, opportunity for price discussions between defendants,[12] or any other facts upon which an inference of price exchange could be based.

The Court concludes that, upon an examination of the evidence as a whole, there is insufficient evidence of the "plus factors" necessary to warrant an inference of concerted action between the defendant steel companies. The actions of each defendant appear to be based upon independent judgment, a consideration of the defendant's own business interest, and an assessment of the competition presented by the other at Newport News.[13] The Court therefore finds that the defendants acting alone have not violated the order.

### 2. Planned Common Course of Action Among Newport News and the Defendants

The Court must now determine whether a planned common course of action in violation of the order has been established against Newport News and the defendants. As the Court noted earlier, most of the evidence of record involves actions, decisions, and communications of Newport News. The crucial question is whether these actions were based on independent judgment or were a product of concerted action and therefore part of a planned common course of action.

The actions of Newport News relevant to this claim can be divided into two categories. The first category involves Newport News' practice in awarding bids. The second involves communications by Newport News to an individual defendant concerning price.

### a. Division of Awards by Newport News.

The facts most pertinent to the first category are (1) Newport News' division of awards between U.S. Steel and Lukens on approximately a fifty-five to forty-five percentage basis; and (2) the failure of Newport News to award Bethlehem any HY-steel orders, even though Bethlehem, at times, submitted bids identical to those submitted by U.S. Steel and Lukens.

The division of awards between U.S. Steel and Lukens was premised, in part, upon Newport News' desire to avoid dependence on a single supplier. HY-steel plates are a critical element in the production of combat vessels for the Navy. Newport News was apprehensive that, in the event of a national disaster or labor strike, its primary reliance on one supplier could cause delay in production. The purpose of

---

**12.** Plaintiff's reliance on a meeting, which was primarily concerned with metallurgical matters, is insufficient. The meeting, attended by representatives from Penn Galvanizing, Electric Boat (a competitor of Newport News), and Alan Wood Steel Company (which does not produce HY–80 and HY–100 steel plates), occurred ten days subsequent to U.S. Steel's public announcement of the withdrawal of prices.

**13.** These actions are clearly distinguishable from those in *Interstate Circuit, Inc. v. United States*, 306 U.S. 208, 226, 59 S.Ct. 467, 83 L.Ed. 610 (1939). The actions of the defendants in that case were most rationally explained when considered in light of the similar behavior of their competitors.

1194

Newport News' policy of maintaining multiple sources of supply was to assure a steady supply during times of emergency. Newport News also believed that it would be easier to obtain steel in times of emergency from a company that was an established supplier of this specialized product, HY-steel. Newport News thus attempted to establish a good rapport with its suppliers; it hoped that such a relationship would facilitate earlier delivery or accommodation upon short notice.

Newport News, in defending its failure to award orders to Bethlehem even though Bethlehem at times submitted identical bids,[14] stated that there was nothing to be gained by adding a new, untried supplier at no price advantage. It stated that it attempted to get Bethlehem to underbid U.S. Steel and Lukens and break the market between U.S. Steel and Lukens.[15] Newport News contended that three identical bidders would not be an advantage since it would not break the market.

The FTC contends, however, that Newport News' award practices are evidence of its central role in the price maintenance scheme. According to the FTC, Newport News agreed to divide the awards between U.S. Steel and Lukens if the two steel companies would submit identical bids. The FTC claims that Newport News entered into this arrangement to assure a steady supply of HY-steel at all times; U.S. Steel and Lukens agreed to bid uniformly in order to be assured a percentage of the awards at Newport News.

b. *Communications of Newport News to Each Defendant.*

The FTC contends that the evidence demonstrating that Newport News gave each of

the defendants information on HY-steel prices strengthens the inference of concerted action. The FTC claims that Newport News provided U.S. Steel with general information on Lukens' pricing system, advised Lukens of U.S. Steel's price announcement, and, on occasion, conveyed information on particular bids. Newport News allegedly would tell each defendant that in order to participate in the business at Newport News, it must remain competitive. Finally, the FTC focuses on Newport News' practice of checking prices after a bid was submitted but prior to the award.

Much of the evidence offered to support these allegations involves events that occurred prior to the statute of limitations period. Plaintiff contends that these events, which occurred during the early stages of the alleged conspiracy, reveal the understanding that arose among the parties and shed light on the subsequent behavior of the parties.

It appears from the evidence that Newport News on occasion did engage in the above practices. At times, Newport News would discuss in a general way one defendant's pricing system with the other. After Lukens adopted a new pricing system in mid-June, 1966, Newport News notified U.S. Steel that it would have to be competitive with the new price schedule if it wished to continue to participate in the business at Newport News. *See* Exh. 212A. U.S. Steel responded that it intended to be competitive for "this good account." *See* Exh. 212B. In late 1965 and early 1966, Newport News advised U.S. Steel that its prices were $.20 per pound higher than Lukens' prices computed on a delivered basis, that U.S.

14. The fact that Bethlehem's bids were at times identical to those of U.S. Steel and Lukens undercuts to some extent the implication that identical bidding resulted from the concerted action of the defendants, the defendants and Newport News, or Newport News and each defendant.

15. Daniel F. Galvin, assistant purchasing agent (1963–1971) and presently director of material acquisition for Newport News stated in his deposition:

I told Bethlehem Steel at this point we were trying to break the market between U.S. Steel and Lukens. We invited Bethlehem Steel to bid and we tried to get them in the business. But when we received identical bids at this point [sic] was the time if you were going to break anything, it was to break it in the beginning; and we told them that we don't need identical bids.
Tr. 1868.

Steel must be competitive to continue participation, and that Lukens continued to use published prices that had been in effect for some time. In early February, 1966, Newport News expressed its displeasure over U.S. Steel's failure to quote a competitive price. Newport News stated that it neither had the time nor the resources to check each price on each order to determine if U.S. Steel was competitive. It requested that U.S. Steel's price be competitive on the first round. *See* Exh. 211C. Very shortly thereafter, Newport News told U.S. Steel that unless it was advised otherwise, Lukens' current mill prices were the same as U.S. Steel's prices prior to the withdrawal of its price lists. *See* Exh. 211D. Newport News further informed U.S. Steel that its prices were $.20 per pound too high due to higher transportation prices from its Homestead plant. U.S. Steel responded that it would be competitive on orders not exceeding $100,000.00. See Exh. 211E.

Lukens received relatively little information from Newport News concerning U.S. Steel's general pricing system for HY-steel plates. At the end of March, 1966, Newport News informed a Lukens' sales representative that U.S. Steel "was quoting lump prices on inquiries all or nothing." Exh. 153. Lukens then determined that U.S. Steel's prices were lower than its prices. Also, in May, 1966, Newport News showed a Lukens' sales representative U.S. Steel's bid on the last order.

Newport News in a few instances communicated more specific information on particular bids. Plaintiff notes two instances in which Newport News advised U.S. Steel that specific bids for particular size plates were $1.50 per pound high. U.S. Steel in one case, reduced its price in future quotations. *See* Exh. 190P, at 1. In the other case, U.S. Steel reduced its price by $1.50 per pound on the relevant plate size thirteen months later. *See* Exh. 190R(1). In June, 1962, U.S. Steel, after learning from Newport News that Lukens had low-

ered its prices on certain plates, adjusted its price to be competitive with Lukens' price. *See* Exhs. 244; 190S. After Newport News, in April, 1968, provided U.S. Steel with pricing information from Lukens' component specification sheet,[16] U.S. steel revised its price to be competitive with Lukens' prices. *See* Exhs. 190I(2); 190I(3). Finally, the FTC notes that U.S. Steel increased its price on plates over three inches, after it received information from Newport News that Lukens charged for double quenching and tempering on HY-steel plates over three inches instead of only on plates over four inches. *See* Exh. 190L, at 1.

The specific price information that Newport News conveyed to Lukens concerned whether and when U.S. Steel planned to adopt a price change. In four of the five instances cited by plaintiff, Newport News advised Lukens either that U.S. Steel was not increasing its prices, that U.S. Steel's price increase was effective at a later date than Lukens' announced increase, or that Lukens was not competitive. In these cases, Lukens lowered its price to be competitive. In the other incident cited by plaintiff, Newport News informed Lukens that U.S. Steel would raise its alloy price effective July 28, 1969. Lukens subsequently notified Newport News that its prices would be increased effective July 28, 1969. However, it added that it heard reports that it might not then be competitive with at least one supplier. It assured Newport News that, while it considered a price increase necessary, it intended, in the final analysis, to be competitive. *See* Exh. 126.

When he was Newport News' steel buyer (late 1967 through 1973), Leonard M. Outland would on occasion, after submission of bids but prior to the award, call defendants to question prices on bids. Mr. Outland would check bids after either a comparison of a bid with an earlier bid involving a plate of the same size or a comparison of competitors' bids. He would telephone either Luk-

---

16. Component specification sheets, which provided prices for extra services such as testing, double quenching and tempering ultrasonic testing, and painting, were sent to the Navy, Newport News, and Electric Boat, and to other HY-steel customers only upon request.

ens' service representative in Richmond, Eileen T. Tyler, or U.S. Steel's service representative in Baltimore, Richard F. Chase, or both to check items or prices submitted on a particular bid. If Outland checked with both defendants on bids for the same order, he usually questioned the defendants on different items. Typically, one or both of the defendants would correct the price of the questioned item or items on the bid. After corrections were submitted by one or both defendants, the bids would be identical when freight to Newport News was added to their bids.

Plaintiff documents twenty-three instances involving price corrections and subsequent identical bids during the statutory five-year period. However, the evidence does not show that a telephone call from Mr. Outland preceded all of these price corrections. During this period, 25,000 to 30,000 quotations for steel products passed across Outland's desk. The evidence reveals that some of the corrections ultimately resulted in decreases in the prices for these items.

The defendants admit that Outland would on occasion call to check prices. However, they claim that such price checking was not illegal but rather normal business behavior for a customer and supplier. They contend that sometimes errors were made in their bid submissions. Some mistakes were caused by a misquotation and others by the incorrect addition of the various components. They also point out that a contracting officer is required, pursuant to the Armed Services Procurement Regulations, 32 C.F.R. §§ 2-406.1 to 2-406.3 (1976), to verify prices if there is an apparent mistake. Finally, Lukens notes that Newport News could easily detect a mistake in Lukens' quotations. Newport News would have reason to check on a deviation from published prices, since they knew that Lukens generally adhered to published prices. Lukens preferred to be made aware of a mistake before the award of the contract,

since it would bill the customer on the basis of its published prices. The discovery of the error prior to the award would avoid later problems with the customer.

Plaintiff maintains that the price verification served as a mechanism to maintain prices. It contends that such mistakes were not apparent mistakes to which the Armed Services Procurement Regulations refer.

### c. Role of Defendants in Three-Party Concerted Action.

Each defendant was aware of the approximate percentage of the awards it had received over the years. When Armco began submitting lower bids and therefore receiving awards at Newport News in 1972, both U.S. Steel and Lukens attempted to ascertain Armco's pricing system and the percentage of awards it had received. Both parties received some information in this regard. U.S. Steel maintained figures on its participation rate. Lukens, at one point, asked Newport News what participation rate it could expect at Newport News if it continued its current pricing policies or if it bid competitively with Armco. Newport News informed Lukens that its participation rate would decrease if it were not competitive with Armco.[17]

The FTC maintains that in addition to seeking information concerning participation rates from Newport News, the defendants cooperated with Newport News and thus furthered the price-fixing scheme. It further contends that this evidence and that offered in support of the two-party concerted action claim, see section IIC.1 above, when viewed as a whole, support an inference of concerted action.

### d. Whether the Evidence Supports an Inference of Concerted Action.

The FTC urges the Court to adopt the inferences it draws from the evidence, and from these inferences, reach the ultimate

---

17. On February 8, 1973, Lukens informed Newport News that it would discontinue submitting bids on HY-steel plates. It made this decision, even though it was still receiving orders from Newport News and expected to continue to receive orders on plates that Armco could not produce.

inference of concerted action among Newport News, U.S. Steel, and Lukens. The FTC infers that during the early stages of the conspiracy, the parties established a complicated system of communication from which each party understood the role it played in the scheme and the results of such a scheme. For example, the FTC contends that the defendants understood that, when Newport News informed them that they must remain competitive, competitive meant the same price. The FTC infers that U.S. Steel, based on information supplied by Newport News, utilized Lukens' prices as a formula upon which U.S. Steel based its bid to Newport News. The FTC infers that Newport News would advise Lukens of U.S. Steel price changes so that Lukens could adjust to U.S. Steel's planned changes. According to the FTC, Newport News used several other mechanisms in an effort to eliminate bid differences. The price verification by Newport News and subsequent revision by the defendants as well as the communication, on a few occasions, of the amount by which a bid was not competitive, increased the incidence of identicality. The FTC infers that defendants began to rely upon Newport News to notify them of any price differences in the bids. It also infers that each defendant was aware of its participation rate at Newport News and knew that it could expect to continue to participate at such a rate if each defendant submitted competitive or identical bids. It further infers that each defendant, when Newport News offered it increased participation in exchange for lower bid submissions, declined to reduce its prices; each defendant continued to submit identical prices, even though contrary to its self-interest.

The FTC claims that the evidence supports the conclusion that Newport News, in effect, agreed to allocate the awards between Lukens and U.S. Steel in exchange for the defendants' agreement to bid identi-cally. It contends that, based on the evidence of record and the inferences that it draws from the evidence, an inference of conspiracy is warranted.

For the reasons set forth below, the Court concludes that an inference of conspiracy is not warranted in this case. As the Court of Appeals for the Third Circuit held, an inference of concert may be warranted when there is evidence of (1) motivation to enter into an agreement and of (2) acts in contradiction of each party's economic self-interest. *See Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). The plaintiff has failed to provide sufficient evidence in support of either of these factors.

After a searching inquiry into this extensive record, the Court is unable to find evidence from which a plausible motive of Newport News may be inferred. The Court finds it incredible that Newport News, solely because it wanted to secure a steady supply of HY-steel in case of emergency, would risk possible antitrust prosecution and jeopardize a contract with the Navy involving over two billion dollars. It is unlikely that Newport News would subject itself to such risks solely to provide for a purely hypothetical supply shortage.[18]

Moreover, it would not be in Newport News' self-interest to participate in an arrangement that resulted in higher than competitive prices. While it might be in the interests of defendants to agree to submit higher than competitive bids, such an agreement would diminish Newport News' profits. Under the terms of the fixed price incentive contract entered into between the Navy and Newport News, if the final cost were less than the projected cost, Newport News would receive a percentage of the difference between the two costs. The FTC has failed to proffer any credible evidence of motivation for Newport News to enter

---

18. This is not to say that Newport News had *no* motivation to attempt to assure itself of a steady supply of HY-steel during periods of shortage. While this was an interest of Newport News, it was not of such importance that it would risk possible antitrust liability. Furthermore, Newport News found it unnecessary to engage in any concerted action to achieve a steady supply. *See* text at 1197 *infra*.

into an agreement to maintain prices in violation of the order.

In addition, the Court concludes that the evidence concerning bid awards and price communications appears to be in the economic self-interest of Newport News and therefore a product of unilateral action rather than of concerted action among the defendants. Newport News' division of the awards between the two companies clearly furthers its own economic interest. It hoped to receive priority treatment from the two companies during times of emergency, because it had awarded a large percentage of its orders to and established a good relationship with both companies. It appears from the record that the failure to award bids to Bethlehem resulted from an independent decision of Newport News: Plaintiff has failed to submit any evidence that demonstrates the steel companies' involvement in this decision.[19]

Similarly, the various price communications by Newport News, rather than being contrary to self-interest, appear to advance its economic self-interest. More often than not, the communications led to a reduction in the price of a bid. For example, Lukens at times altered its published prices, which resulted in lowered prices, and U.S. Steel subsequently met the lowered price. Lukens, when informed that U.S. Steel was not announcing a price increase or was announcing it at a later date, would decide not to announce or to postpone the price increase. Some of the price information that Newport News transmitted merely corroborated information defendants had already obtained from other sources, including other customers of Lukens and U.S. Steel. Lukens' published alloy steel plate prices

and its price announcement were distributed to its customers. Most of the communications merely reflect Newport News' continuing efforts to lower the price of the bids it received, although these efforts were not always successful.[20]

Moreover, the Court concludes that even the tactics that seem most questionable, the price verifications by Newport News after submission of bids but prior to award, are premised upon unilateral action. The Armed Services Procurement Regulations provide:

> After the opening of bids, contracting officers shall examine all bids for mistakes. In cases of apparent mistakes, and in cases where the contracting officer has reason to believe that a mistake may have been made, he shall request from the bidder a verification of the bid, calling attention to the suspected mistake.

32 C.F.R. § 2–406.1 (1976). Even though some of the mistakes may not have been readily apparent, the contracting officer may well have had reason to believe that a mistake had been made through a comparison of bids with previous bids as well as by comparing one competitor's bid with another. In any event, the evidence does not demonstrate that the price verification and price corrections resulted from the concerted actions of the parties. Newport News' decision to check prices appears to have been independently motivated. Finally, plaintiff points to twenty-three instances of price corrections and subsequent price identity during the five-year period. When considered in light of the fact that the prices of bids often decreased after corrections and that Newport News received 4,000 to 6,000 orders for steel products per year,

19. However, Newport News' contention that the submission of identical bids by a third supplier would not be in the economic interest of Newport News, since it would not alleviate the identicality problem, is unpersuasive, particularly in light of the fact that Newport News was concerned about the difficulty of maintaining a steady supply.

20. Newport News often informed the defendants that in order to participate in future business at Newport News, they must remain competitive. The evidence reveals that on at least one occasion, Newport News notified Lukens that it was not competitive on specific items and further inquired whether it would meet the competitor's price. See Exh. 424B, at 5. This inquiry, although contrary to the general practice of Newport News not to contact a steel company and ask it to meet another company's price on HY-steel plates, was neither contrary to its self-interest nor a product of concerted action.

these instances of price correction do not appear to be significant or a device utilized by the three parties to assure price identity.

The actions of Lukens and U.S. Steel, even when considered along with the actions of Newport News, appear to be based on unilateral action. While the bids of Lukens and U.S. Steel were identical a substantial amount of the time, Bethlehem at times also submitted bids identical to the defendants' bids. This suggests that the bid identity may well be explained by legitimate business reasons. Indeed, as discussed earlier, where the product is standardized or fungible, even if specially produced by only a few companies, price identity may be the natural result.

While it was the ultimate policy of both U.S. Steel and Lukens to bid competitively at Newport News, each defendant used different pricing methods. Lukens' general policy was to adhere strictly to published prices. When Lukens learned of a price announcement or change by another major producer, its decision to announce a price change was often affected. Although Lukens' price changes were usually identical to those of U.S. Steel, Lukens, in determining price changes, considered many other factors, including the behavior of the other major producers and conditions within the industry. Lukens received information about the other producers' price changes from customers other than Newport News (*i. e.*, Westinghouse, Sunnyvale, Wyatt Industries, and Mosher Steel), as well as Newport News and from trade journals.

The policy of U.S. Steel, after it withdrew its published prices in 1965, was to quote a lump sum price based on the size and attractiveness of the inquiry. In determining this price, U.S. Steel considered, among other things, the bids of its competitor, Lukens. U.S. Steel attempted to obtain information on Lukens' prices from Newport News and other customers as well as from an examination of awards in public bidding. Finally, in order to be competitive

at Newport News, U.S. Steel absorbed the difference in freight rates between U.S. Steel's mills to Newport News and Lukens' mill to Newport News. Freight absorption was independently pursued by U.S. Steel and is expressly permitted by the order. U.S. Steel thus independently developed an internal price list that reflected a price competitive with Lukens' prices.[21]

Finally, the Court finds unconvincing the FTC's reliance on the defendants' attempt to ascertain their participation rate at Newport News. Indeed, each defendant independently attempted to approximate the amount of business it could expect to receive. Understandably, when Armco began receiving orders in 1971, the defendants' concern over their participation rate increased. For example, as noted earlier, Lukens inquired of Newport News what participation it could expect at Newport News if it should continue its current pricing policy or if it should become competitive with Armco. Newport News responded that Lukens should become competitive or suffer a lower participation rate. It appears to the Court that defendants' concern and inquiries about participation rate reflect normal business behavior. Similarly, Newport News' responses reflect the actions of an independent purchaser seeking the lowest competitive price rather than those of a co-conspirator.

The Court therefore concludes, after evaluation of hundreds of documents and about 2,000 pages of testimony, that the actions and policies of Newport News, Lukens, and U.S. Steel were based on independent, rational business decisions. Plaintiff has failed to present adequate evidence either of motive to enter into an agreement or of acts, which if pursued by one party alone, would be contrary to its self-interest. The evidence fails to support an inference of concerted action among Newport News and the defendants.

---

**21.** U.S. Steel utilized a different internal price list for bids to government agencies under $100,000 and for bids to customers other than shipyards under 50 tons, and after September, 1968, under 40,000 pounds. The Court finds nothing irregular about this pricing system.

3. *Planned Common Course of Action Between Newport News and Lukens or Between Newport News and U.S. Steel*

Having concluded that plaintiff has failed to prove that defendants Lukens and U.S. Steel or the defendants and Newport News engaged in a planned common course of action to violate the order, the Court must necessarily find that plaintiff has failed to prove a planned common course of action between Newport News and Lukens or Newport News and U.S. Steel. Accordingly, the Court holds that plaintiff FTC has failed to prove by a preponderance of the evidence that defendants Lukens and U.S. Steel, or either of them, have violated any of the terms of the order in *American Iron & Steel Institute*, 48 FTC 150 (1951).